IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION AT LEXINGTON

HAROLD DAVID COWDEN, et al,

      Plaintiffs,            5:09-CV-323
                                Lexington, Kentucky
  vs.                       March 14, 2013
                                1:30  p.m.
PARKER & ASSOCIATES, et al,

                                **MOTION HEARING**
      Defendants.


                TRANSCRIPT OF PROCEEDINGS
      BEFORE THE HONORABLE KAREN K. CALDWELL,
          UNITED STATES DISTRICT JUDGE


APPEARANCES:

FOR THE PLAINTIFFS:    K. GREGORY HAYNES, ESQ.
                      MITZI D. WYRICK, ESQ.
                      Wyatt, Tarrant & Combs
                      500 West Jefferson Street
                      PNC Plaza, Suite 2800
                      Louisville, KY  40202

                      BRIAN M. GUDALIS, ESQ.
                      Ward, Hocker & Thornton
                      333 West Vine Street, Suite 1100
                      Lexington, KY  40507

FOR THE DEFENDANTS:    MARGARET MILLER, ESQ.
                      Bingham Greenbaum Doll
                      3500 National City Tower
                      101 South Fifth Street
                      Louisville, KY  40202

                      JOEL S. FELDMAN, ESQ.
                      Sidley Austin LLP - Chicago
                      One South Dearborn Street
                      Bank One Plaza
                      Chicago, IL 60603

APPEARANCES: (Continued)

COURT REPORTER:                 Rhonda S. Sansom, RPR, CRR
                                Federal Official Court Reporter
                                United States District Courthouse
                                101 Barr Street, Room 413
                                Lexington, KY  40507
                                (859) 619-3624

ALSO PRESENT:                   Mr. David White

Proceedings recorded by mechanical stenography, transcript
produced with computer.

1       (At 1:30 p.m. on March 14, 2013, with counsel for the

2   parties and the parties present, the following proceedings were

3   had.)

4       THE HONORABLE KAREN K. CALDWELL:  Will the Clerk please

5   call the matter to come before the Court.

6       THE CLERK:  Yes, your Honor.  Lexington Civil Matter

7   99-323, Harold David Cowden and others versus Parker &

8   Associates, Incorporated., and others, called for a motion

9   hearing.

10      THE COURT:  Thank you.  Would counsel for the plaintiffs

11  please make their appearance for the record.

12      MR. HAYNES:  May it please your Honor, my name is

13  Gregory Haynes.  With me is my partner, Mitzi Wyrick.  We

14  practice with the firm of Wyatt, Tarrant & Combs.

15      Also present is our cocounsel, Brian Gudalis, with the

16  firm of Ward, Hocker & Thornton.

17      And at the appropriate time, your Honor, Ms. Wyrick will

18  present the plaintiffs' position on certification.

19      THE COURT:  Very well.  Counsel, thank you very much.

20      Counsel for the defendant.

21      MS. MILLER:  Good afternoon, your Honor.  I've been

22  called in by Ann Chesnut, who regrets she can't be here because

23  she had an automobile accident.  She is fine, but she was in a

24  tow truck when I talked to her.

25      THE COURT:  All right.

1          MS. MILLER:  Your Honor, I'm Margaret Miller, from

2    Bingham Greenbaum Doll, on behalf of the defendant.  With me is

3    cocounsel, Joel Feldman, with Sidley Austin of Chicago, and

4    David White, senior vice president of operations from One Life

5    America.

6          THE COURT:  All right.  Counsel, Mr. White.  Thank you

7    all for being here today.

8          The defendants have requested a hearing in this matter,

9    as I recall, and I just want to be sure that I understand the

10   lay of the land before we proceed in this case.

11         First of all, from your papers it appears to me, at

12   least, that the defendants do not contest the 23(a) factors of

13   numerosity, commonality, typicality, and a fair and adequate

14   representation but, rather, appear to challenge the predominance

15   and superiority requirements of 23(b)(3).

16         And that seems to be the focus of your papers, at least,

17   in terms of whether this is a general proof matter or a specific

18   proof matter.

19         Have I correctly stated your position?

20         MR. FELDMAN:  That's correct, your Honor.

21         THE COURT:  Very well.  And from a plaintiff's

22   perspective, I want to be sure I understand that what your

23   position is is that the defendants have set out in a common

24   scheme or plan to recruit agents to sell the product and then

25   deprived them of their earned commissions, either by charging

1  for leads, E & O charges, mailing charges, other kinds of things

2  that are charged back against the commissions.  It's a little

3  unclear to me as to whether the plaintiff is alleging that they

4  flat didn't pay the commissions.

5      But have I characterized your claims correctly,

6  Ms. Wyrick?

7      MS. WYRICK:  You have.  We are alleging that they flat

8  didn't pay the commissions, if we haven't made that clear.

9      THE COURT:  All right.  Well, that helps me a little

10  bit.

11      And I guess I wanted to think about how we might proceed

12  today and to tell you, I guess, what some of my concerns might

13  be.  And as I understand the defendants' case, that the issue of

14  predominance and superiority requires generalized proof that

15  applies to the class as a whole.  And what I see here are fraud

16  claims that generally are required to be pled with specificity

17  as to each claim of fraud.

18      And also, there may be an overarching scheme of fraud,

19  but that it may have been implemented through different

20  techniques and methodologies as it relates to, for lack of a

21  better term, I will call them the victim agents.

22      Is that a fair understanding of the situation,

23  Ms. Wyrick?

24      MS. WYRICK:  To some extent.  We believe that there is

25  an overarching scheme but that it was implemented in the exact

1  same way towards all the agents.

2          THE COURT:  Okay.

3          MS. WYRICK:  That's the only clarification.

4          THE COURT:  It was implemented in the same way?

5          MS. WYRICK:  Yes.

6          THE COURT:  How many total class members do you

7  estimate?

8          MS. WYRICK:  We have seen different estimates from the

9  defendants; but it's at least 1,800, can be as much as 3,000.

10          THE COURT:  All right.

11          MR. FELDMAN:  Your Honor, we believe it's 6,500 and say

12  so in our papers.

13          THE COURT:  Okay.  And, Ms. Wyrick, what do you

14  anticipate the typical amount of damage is that each class

15  member would be seeking?  I understand that they may not be the

16  same, but do you have a range?

17          MS. WYRICK:  I don't really have a range of the typical

18  amount, because agents wrote for different periods of time.

19  They would come in and out during this class period, so it's

20  difficult to come up with a typical number.

21          THE COURT:  Okay.  And let me ask the defendant

22  something, just so I understand its business model.

23          The consumers were not charged for these additional

24  Medicare Part C and D components; is that correct?

25          MR. FELDMAN:  Correct, your Honor.  That's a matter of

1  federal law and regulation.  And once Medicare Advantage, which

2  is in a certain sense privatization, or one kind of

3  privatization of Medicare, once those regs were passed then

4  health carriers -- Humana, Coventry, and others -- went into the

5  market.  So there is no premium charged.

6        THE COURT:  It is so odd, because usually commissions

7  are derived based on insurance premiums.  I guess the government

8  just subsidizes that?

9        MR. FELDMAN:  Your Honor, it is odd.  I will tell you my

10  specialty is defending insurance companies in class actions, and

11  usually the commissions are based on the amount of the insurance

12  policy or the annuity, but not here.

13        THE COURT:  Based on what you bring in from your

14  premium.  That's why I can't understand where this premium base

15  lies; I guess from the United States Treasury.

16        MR. FELDMAN:  Probably from all of us.

17        THE COURT:  All right.  I don't know how you want to

18  proceed today.  I don't know if you have prepared a

19  presentation, Ms. Wyrick.

20        MS. WYRICK:  We have prepared a PowerPoint, if it would

21  please the Court.  I have a hard copy that I could hand to the

22  Court and opposing counsel.

23        THE COURT:  That would be helpful.

24        The defense, Ms. Miller, do you all have a presentation

25  that you would like to make?

1    MR. FELDMAN:  Your Honor, I do have a presentation.  I

2  think my presentation would be 30 minutes or less.

3    THE COURT:  All right.  I want to hear what you want to

4  tell me, and then I have some questions for you.  So why don't

5  we proceed first with your presentations.

6    And Ms. Wyrick, you may proceed.

7    MS. WYRICK:  Thank you.

8    THE COURT:  You may proceed.

9    MS. WYRICK:  Okay.  Thank you.

10    As the Court has noted, we are here today on plaintiffs'

11  motion for class certification.  And the class that we are

12  seeking to have certified are the people who entered into

13  agreements with the defendants, Parker & Associates and the

14  companies affiliated with them, which we call the Parker

15  Companies, and who acted as agents for placing Medicare

16  Advantage Plan, Parts C and D, with insurers in return for

17  monetary commissions and renewal fees in Kentucky and throughout

18  the United States.

19    I won't go into the background a great deal, but just to

20  give the Court a little bit of an idea how these plans came

21  about.  Mr. Feldman has already told you a little bit about

22  them.  But they are essentially low-cost or no-cost plans

23  subsidized by the federal government that are placed with senior

24  citizens.

25    And because of the low-cost and no-cost features of this

1   product there's a low rate of cancellation, as you might

2   imagine.

3          And these plans became available in 2004, and that's

4   when Parker & Associates and the Parker Companies began selling

5   the Medicare Advantage Plans.

6          And to give you a little bit of an idea of how these

7   Medicare Advantage Plans are placed, the insurance companies who

8   are backing the plan, so to speak, have standard contracts with

9   the Parker companies.  If an agent wants to write for a

10  particular carrier they also sign up with the insurance company,

11  but they are agents of a particular company, like the Parker

12  companies.

13         And here, the companies needed a way to market these

14  plans, so the Parker companies went out and recruited agents so

15  that they could do this.  And the agents would place these plans

16  with the consumers, the carriers would approve the plans, the

17  commissions would go back to the Parker companies and then were

18  supposed to come back to the agents.

19         That didn't always happen, and that's why we're here

20  today.

21         Our key claims are that the Parker companies have failed

22  to pay the commissions that are owed to the agents and that they

23  were charged improperly for things like mailing fees and errors

24  and omissions insurance that came off the top of some of the

25  commission payments.

1        THE COURT:  Now, I understand that it would have been

2   appropriate for the Parker companies to keep a portion of that,

3   obviously, if they are going to be brokering this out.  And I

4   saw something in the papers that the commissions were 4 to 6

5   percent.  Did Parker take a cut of that commission, or was that

6   Parker's?  Whose commission was that?

7        MS. WYRICK:  The $4 per month renewal commissions, that

8   was for the agents.  But when money came in from the insurance

9   carriers, it came in in a bigger block, so to speak; and the

10  Parker companies took their cut, and they were supposed to pass

11  it along down the line to the agents.

12       THE COURT:  All right.  Please proceed.

13       MS. WYRICK:  And we have two class representatives for

14  this class.  The first is Mr. Jason Biddle.  He wrote Medicare

15  Advantage Plans beginning in 2004 for the Parker companies, and

16  he wrote primarily for United Healthcare in Ohio and for Humana

17  in Kentucky.

18       He stopped writing for Parker & Associates in 2006,

19  primarily because he wasn't getting his renewal commissions.

20       Mr. Dave Cowden is another one of our class

21  representatives, and he worked his way up to management at

22  Parker & Associates.  He was a district manager at one point and

23  then became a regional manager at Great American Marketing

24  Group, which is one of the Parker companies.

25       He placed Medical Advantage Plans while he was a

1  district manager; and then he was also, as a member of

2  management, overseeing the other agents and entitled to

3  overrides from agents who were below him in his hierarchy.

4      And as the Court has noted, the Rule 23(a) elements of

5  numerosity, commonality, typicality, and adequacy of

6  representation have not been challenged by the defendants here.

7  So instead, what we are focusing our presentation on here today

8  is Rule 23(b)(3).

9      As the Court is likely aware, that rule requires that

10 common questions predominate over individual questions and that

11 a class action would be a superior way of proceeding.  And we

12 believe that the proof will be that it is.

13     There is classwide proof, and the cases say that you

14 focus on the defendants' common practices or uniform behavior to

15 show that.  And we believe that the state law claims, such as

16 they are, are manageable and can be easily addressed through

17 interrogatories and separate verdict forms, if necessary.

18     THE COURT:  Well, they're all common-law claims,

19 right --

20     MS. WYRICK:  They are common law claims.

21     THE COURT:  -- not statutory claims?

22     I was looking at -- one of the parties pulled out all of

23 the state statutes by state, but it looks like that in those

24 statutes they basically provide some form of the same relief.

25 Can you point out any to me that don't?

1    MS. WYRICK:  I'm not aware of any, right off the top of

2  my head, that don't.  And I think certainly, if going down this

3  path we become aware of any, that's something that can be

4  addressed through special interrogatories and verdict forms.

5  And I'll talk in a little more detail about the separate counts

6  as we go along.

7    THE COURT:  All right.

8    MS. WYRICK:  The Parker companies recruited agents so

9  that they could get these Medicare Advantage Plans placed

10  through a number of standard ways:  They used mass mailings,

11  they used PowerPoints in seminars, and they used print

12  advertisements.

13    And this is an example of a slide from a PowerPoint

14  presentation that was used to recruit agents, and it

15  specifically says that they are entitled to $4 a month in

16  renewals per member after the policy has been in place for a

17  year.

18    This is an example of a memo that was submitted to the

19  marketing people in the Parker companies in 2005, attaching a

20  template for a PowerPoint presentation to be used to recruit

21  agents.  And if you'll look at the last paragraph, it says that

22  "Make sure that you change the corporation name and make any

23  appropriate changes as you do this.  And we're preparing these

24  for each company that places the insurance."

25    So they were preparing these for every company that they

1  had, and they were using these slides and PowerPoint

2  presentations to recruit agents for all of their companies.

3      They even had a slide and a template telling everyone to

4  "Make sure you put your own corporation name on these templates

5  before you -- before you show them and to check for any changes

6  that were particular for your marketing company."

7      And again, this example was in the template that

8  Medicare Advantage sales entitled agents to $4 in renewals

9  starting the 13th month after the life of the policy.

10      And as our class representative, Jason Biddle, noted,

11  the renewal amount may differ from insurer to insurer but the

12  system in place does not.

13      And the Parker companies failed to pay renewals to the

14  agents, and this is a widespread problem that affected everyone.

15  The defendants have admitted that the Parker companies did not

16  pay any commissions to agents from sales from Humana and United

17  Healthcare until 2006, even though the Parker companies

18  themselves were receiving renewal commissions.  That is

19  certainly a claim that can be addressed on a classwide basis,

20  because they have taken the same position with respect to all

21  the agents.

22      And the defendants themselves have recognized that

23  renewals were a problem for them.  And in this e-mail, they

24  said, "I realize we have lost agents in the past due to not

25  receiving their renewals."  These were agents like Robert

 1    Biddle, our class representative, who left because he was not

 2    being paying his renewals.

 3         And the Parker companies were having difficulties with

 4    some of the carriers, like Humana and United Healthcare, and

 5    went back and negotiated with them regarding what they should

 6    have been paid.

 7         As a part of those negotiation, they reached

 8    multi-million-dollar settlements with Humana and United

 9    Healthcare.  None of those multi-million-dollar settlements were

10    paid to agents, none of the charge-back that had been charged to

11    agents were forgiven as part of their settlements.

12         And that was admitted by the Parker companies in a

13    30(b)(6) deposition through their representative, Mr. David

14    White, who is here today.

15         This is, in fact, the Humana settlement agreement

16    providing that the Parker companies were receiving $4 million in

17    commissions which the agents saw none of.  And there is a

18    similar settlement agreement through United Healthcare.

19         So the question comes:  How do you determine what to pay

20    an agent?  And the answer is through commission grids.  And the

21    Parker companies developed these commission grids for every

22    carrier that they had.  The carriers would tell the Parker

23    companies, "Here are the commissions that we're going to pay

24    you."  The Parker companies would then take those commissions

25    and put them on a commission grid.

1        And the 30(b)(6) representative has admitted that there

2   is a commission grid for every carrier which has been generated

3   in the ordinary course of business since Parker began selling

4   the MA plans.  And the commission -- all the commissions went

5   through the commissions of Administrative Services, which is one

6   of the Parker Companies.

7        This is an example of one of the commission grids with

8   just the lower-tier agents on it.  And again, this shows that

9   they were entitled to $4 a month on renewals.

10       This is an example of a commission grid outlining all

11  the different layers in the hierarchy, and each person could

12  find where they fell in the hierarchy and see what kind of a

13  renewal commission they were entitled to.

14       But again, they had these commission grids for every

15  carrier, for every level of agent, and it's simply a matter of

16  plugging them in.

17       THE COURT:  Are these in your exhibits tendered to the

18  Court?  I looked through them and I couldn't find one.

19       MS. WYRICK:  I believe that they are.

20       THE COURT:  I was hurriedly looking through to see if I

21  could find one to see what they look like, but I'll make an

22  effort if you think they're in there.

23       MS. WYRICK:  I think they were Exhibit 2 in the Parker

24  deposition, as well.

25       THE COURT:  I think this one is noted as Exhibit No. 3

1   to the Parker deposition.

2           MS. WYRICK:  Uh-huh.

3           THE COURT:  Okay.

4           MS. WYRICK:  Another example of a common way that the

5   agents were treated is through the rounding up of the charges.

6   The Parker companies rounded up charges, such as mailing

7   charges, to each of the agents.

8           And they also charged every agent the same amount of

9   errors and omissions insurance, whether that errors and

10  omissions insurance actually bore any relation to the actual

11  cost of the policy.

12          And as an example of the charges for the errors and

13  omission insurance, these are weekly agent reports that the

14  Parker companies generated.  And that little call-out number --

15  the 60, 30, the 40 -- those are amounts the agents were charged

16  for errors and omission insurance.

17          THE COURT:  Aren't insurance agents required by most

18  states to carry their own E&O insurance --

19          MS. WYRICK:  I don't know whether --

20          THE COURT:  -- in order to be licensed?

21          MS. WYRICK:  They are required to have errors and

22  omissions insurance.  I'm not sure there's a requirement about

23  who pays for it and how much they're charged for it.

24          And here, our contention is that they were being

25  overcharged for it.

1    THE COURT:  All right.  But if the agent already had E&O

2    would there be a duplicate charge here, would be my question?

3    MS. WYRICK:  I believe that there would be, because

4    every month in which an agent sold a policy the Parker companies

5    charged them a charge for errors or omissions insurance.  And it

6    was always a flat amount, like 30, 40, 60; never -- you would

7    think, dividing it over a large number of agents, it would not

8    always be that way.  But it is.

9    And here is another example of errors and omissions

10   insurance being charged to the agents.

11   The other common practice that the Parker companies had

12   was to round up the mailing charges to the agents.  They would

13   routinely send out multiple packages to the agent, sometimes

14   more than one in a day; and when they did this, a lot of times

15   they charged more than the actual cost of the mailing.

16   And this call-out for Mr. Biddle is just one example of

17   that.  But you'll see there's a total charge that's $24 and

18   change there on the right.  But in the handwriting, 18 and 7, it

19   was actually rounded up to an even 25.

20   So they've -- when asked about this, their 30(b)(6)

21   representative conceded that they did round up the mailing

22   charges.

23   THE COURT:  Do you have any idea as to what the total

24   for those mailing charges might have added up to over the course

25   of a year?

1     MS. WYRICK:  We have not attempted to add that up yet,

2  but I believe it would be quite substantial.

3     With regard to uniform practices, we believe that the

4  defendants have recognized that they have uniform practices and

5  common policies that apply to all the agents, and they recognize

6  that when they filed a motion to transfer with this Court they

7  conceded that there were no -- that the individual interactions

8  with the agencies did not govern and took the position that the

9  key decisions took place in Meridian, Mississippi, including how

10  commissions were accounted for and disbursed; how the sales MA

11  plans were structured, including the payments and charges to

12  agents; how the companies interacted with the insurers regarding

13  the sale of the Medicare Advantage Plans; their policies and

14  practices in recruiting agents; their policies and practices in

15  training agents; and their policies and practices regarding

16  their management and interaction with agents.

17     So again, we believe that common questions predominate,

18  and we believe these uniform practices and this uniform

19  treatment of agents by the Parker companies demonstrates that a

20  class is certifiable under Rule 23(b)(3).

21     Now, the defendants have taken the position that because

22  there are state law claims at issue a class cannot be certified.

23  We believe that's not the case, and we have cited examples of

24  cases in our briefs where classes have been certified despite

25  multiple states' law being involved.

1   But even if you have to look at multiple states' laws,

2   we believe there's little meaningful variation among the state

3   laws at issue and any variation can be dealt with through

4   subclasses and separate interrogatories and jury verdict forms.

5   THE COURT:  What are you talking about there?  That's

6   one of my concerns, is how we deal with subclasses.  What are

7   you talking about:  Five, one, two, three?

8   MS. CHESNUT:  Perhaps a subclass for each particular

9   claim, and if you were concerned about a variation in state law

10  you could either deal with it through a subclass or through a

11  separate interrogatory or jury verdict form.

12  For example, with breach of contract we believe it would

13  be appropriate to apply Mississippi law, because that's where

14  the Parker companies are located and the failure to perform,

15  failure to pay the agents actually occurred.

16  But even if you were to look at multiple states' laws we

17  don't believe there's any variation in state contracts.

18  Essentially, the elements are substantially similar in every

19  state.  It's a question of did they pay in accordance with these

20  commission grids?  That's what you are going to be looking at.

21  For promissory estoppel, our analysis of the state law

22  shows that most states rely on the Restatement of Contracts in

23  setting out what the elements of promissory estoppel are.  And

24  if you look at the charts we provided, the key elements are the

25  promise that a person was reasonably expected to induce action

1    or forbearance, that did induce such action or forbearance, and

2    that would be binding because injustice would be avoided only by

3    enforcing it.

4         There are a few different remedies from state to state,

5    and we believe that could be addressed through special jury

6    interrogatories for the states where there were different

7    remedies suggested.

8         THE COURT:  What about the fraud claims?

9         MS. WYRICK:  Fraud claims are, we will admit, the most

10   difficult.  And if the Court were to certify the other claims

11   and not the fraud claim, we would understand that.

12        But we have cited examples of cases where nationwide

13   fraud claims have been certified.  And we believe that here, the

14   defendants' uniform conduct and their uniform presentations

15   would lend itself to a fraud claim.

16        With respect to conversion, again, we believe that

17   Mississippi law could apply because that was where the money was

18   withheld.

19        And again, if you look at the charts that we provided,

20   the conversion law is similar in all states:  Essentially, did

21   the plaintiff have legal ownership or a right of possession of

22   an object or money, and whether the defendant exercised

23   unauthorized control over that property.

24        The defendants had pointed out that demand is sometimes

25   an element of conversion.  And if that's true, we can certainly

1    add a jury interrogatory asking whether demand had been made for

2    those states in which demand is an appropriate element.

3         Unjust enrichment, again, we believe Mississippi law

4    could apply because that, again, is where the money was being

5    held and where the defendant was unjustly enriched.  We have

6    cited examples of unjust enrichment in cases in our briefs where

7    nationwide classes were certified.  And in those cases, the

8    Courts have found that the law of unjust enrichment is similar

9    in all states.  You basically look at whether the defendant

10   received the benefit and whether it would be unfair to the

11   defendant to retain that benefit.

12        To put it simply, we believe that because of the

13   defendants' uniform course of conduct and the amounts at stake

14   that make it difficult for each agent to pursue a class action

15   on their own that it would be an efficient process for

16   litigating the liability of the Parker companies.  And without a

17   class certification, some of these agents are certainly going to

18   be foreclosed from pursuing their claims.

19        THE COURT:  Is that largely because the amounts due may

20   be small?

21        MS. WYRICK:  In some cases, it may be that the amounts

22   are small.  I think the other thing that's been daunting about

23   this is the expense and the -- basically, the expense of

24   pursuing the litigation.

25        We have had to go through a lot of discovery just to get

1    to where we are and looked at literally thousands and thousands

2    of documents.  That's not something your individual agent has

3    the wherewithal to do.

4         THE COURT:  For example, if they owe somebody $10,000,

5    it's not practical for somebody to litigate over that amount --

6         MS. WYRICK:  Absolutely.

7         THE COURT:  -- with the Mississippi company?

8         MS. WYRICK:  Absolutely.

9         THE COURT:  I guess that goes to my issue about are we

10   talking about thousands of small claims?  Is that what makes

11   this an efficient way to proceed?

12        MS. WYRICK:  I think some of the claims are certainly

13   going to be small.  There are going to be some agents who will

14   have larger claims because of the number of policies they

15   placed.  But even those agents, pursuing a case of this

16   magnitude, still, it would not be efficient for them to pursue

17   it on their own.

18        Just to sum up, we believe that the uniform course of

19   conduct engaged in by the defendants here mandates that a class

20   be certified.  There were standard agreements with each of the

21   insurance companies.  The Parker companies refused to pay

22   commissions from at least two of the companies until 2006, even

23   though they were receiving commissions themselves.  They kept

24   settlements from Humana and UHC and did not give agents any

25   credit or reduce any of their charge-backs.

1      They recruited these agents through standard

2  PowerPoints, promising them payment of renewals, and they had

3  commission grids which specified what the payment should be to

4  each of the agents.

5      And the plaintiffs, of course, have all experienced the

6  same losses.  They each had a percentage withheld from their

7  initial commission payment in escrow that was supposed to

8  account for any charge-backs, but no escrow accounts really

9  existed.

10      They never seemed to receive credit for any

11  charge-backs.  They experienced their renewal commissions not

12  being paid, their mailing charges being rounded up, and their

13  errors and omissions insurance being rounded up.

14      We believe that the defendants had a common plan or

15  scheme to deprive the agents of their commissions that they

16  carried out on a widespread basis, and this resulted in losses

17  and damages to each and every class member.

18      And therefore, we believe our motion for class

19  certification should be granted.

20      THE COURT:  Let's go back to the uniform course of

21  conduct.  When you say there are standard agreements with

22  insurance companies, do you mean that Parker & Associates had

23  standard agreements with the insurance companies?

24      MS. WYRICK:  I do.

25      THE COURT:  Okay.

1       MS. WYRICK:  In order to become a -- in order for them

2  to work with a carrier, they entered into a standard agreement

3  with each of the carriers, and that regulated what they would

4  pay to Parker.

5       THE COURT:  Then did Parker enter into standard

6  agreements with the agents who sold the product?  That, to me,

7  seems where the focus should lie.

8       MS. WYRICK:  Parker then took those agreements,

9  developed what the amounts would be to be paid to the agents

10  from each of those agreements, and placed those on the

11  commission grids.

12       THE COURT:  So the commission grids shows what Parker's

13  promises were to the agents?

14       MS. WYRICK:  That's correct.

15       THE COURT:  Did they have any kind of agreement with the

16  agents that was written down?

17       MS. WYRICK:  There was no separate written agreement

18  with the agents.

19       THE COURT:  Okay.  So it made its presentations through

20  PowerPoints?

21       MS. WYRICK:  Uh-huh.

22       THE COURT:  And then how did the agents go about signing

23  on?  How did I know, or how would I know, that these were the

24  Parker agents or the Parker business associates?

25       MS. WYRICK:  They did fill out some forms with the

1  Parker agents basically assigning their commissions to the

2  Parker companies and saying, "You are going to represent us in

3  terms of receiving commission payments and passing those on to

4  us.  And here is what everyone's going to do."

5      THE COURT:  So were those assignment forms uniform?

6      MS. WYRICK:  They are, as far as I know.  I have not

7  seen any variations on those assignment forms.

8      But the assignment forms themselves did not specify the

9  amount of commissions.  That was done through the commission

10  grids.

11      THE COURT:  And so did they incorporate the commission

12  grids by reference in these assignment forms?

13      MS. WYRICK:  No, they did not.

14      THE COURT:  Okay.  But everyone knew to look to that

15  particular grid; for example, if I'm an agent and I'm marketing

16  a Humana program, I would be able to look at the Humana grid and

17  determine what my commission should be?

18      MS. WYRICK:  Yes.  There was no mystery about what they

19  should have been paid.

20      THE COURT:  All right.  Thank you very much.

21      MS. WYRICK:  Thank you.

22      THE COURT:  Yes, Mr. Feldman.

23      MR. FELDMAN:  Yes, your Honor.  Good afternoon, your

24  Honor.  Joel Feldman on behalf of the defendants.

25      First, I do want to thank you for allowing me to

1  practice in your courtroom.  I appreciate it very much.

2      I'd like to start with the legal standard, if I may.

3  The legal standard here really comes down to a very simple,

4  common-sense question, which is:  Can one set of evidence

5  determine the outcome of this case?  Can we try the case in this

6  courtroom, or do we have 6,500 separate trials?

7      And then second:  Can there be one jury instructions or,

8  as your Honor indicated, one, two, three, four or five

9  subclasses; or there be innumerable jury instructions such that

10 instructing the jury is an impossibility?

11      And I think the Sixth Circuit stated it quite well in

12 their recent Pipefitters opinion that we cite in our papers,

13 where in speaking of the legal standard for class certification,

14 the Sixth Circuit noted what pieces of evidence are necessary to

15 prove the class members' claim and the extent to which this

16 evidence would require individualized inquiries.

17      In this District, the Eastern District of Kentucky, I

18 think the Eversole case states it very well, as well, a case

19 here from 2007 before Judge Forester, where it said that if

20 individualized proof is necessary for each putative class

21 member, then class certification must be denied.

22      I'm not as high tech as my worthy opponent, so I will be

23 handing out some exhibits as I speak.  But the first one I would

24 like to address deals with so-called charge-backs, your Honor.

25      THE COURT:  Let me ask you this as you are passing this

1    out:  How many states do -- did your client recruit agents in?

2          MR. FELDMAN:  Your Honor, my understanding is that

3    that's almost all of the states.  If you look at the evidence,

4    and I know you have, but Mr. Cowden -- or Biddle himself states

5    he was a manager for five different states:  Illinois, Indiana,

6    Tennessee, Kentucky, New York.  That's just one manager.  But

7    it's a nationwide program, and it's just about every state.

8          So if I may, your Honor, I would like to start with the

9    notion of charge-backs, because I think this is a critical

10   factual item in the case.  As we noted in our papers, it's the

11   evidence that this Court needs to look at.  I'm going to cite a

12   large amount of evidence, or a decent amount of evidence, in my

13   presentation.

14         Note on the left-hand side that there's one way that

15   Parker could advance money and never get it back, and that's

16   when an application is rejected.  There's numerous reasons why

17   an application is never accepted by an insurance company.

18         The critical item here is that for the first few years

19   of the program, as noted in the evidence, Parker issued

20   commissions to the agents based on what the agents said that

21   they sold.  Then, if an application was rejected by the carrier,

22   Parker was out the money.  It had already issued the checks to

23   the agents.

24         So applications could be rejected for an improperly

25   completed application; multiple applications for the same

1  policy; might decide after you signed up that you don't want the

2  coverage after all; the agent might not be licensed properly;

3  the purchaser could switch plans, go to another provider; or the

4  Medicare ID might not be valid.

5      That's on the left-hand side of the chart, the

6  application rejected.

7      On the right-hand side is a policy could be disenrolled.

8  And when the Plaintiffs in their brief speak of a limited number

9  of disenrollments, they're on the right side of the chart, and

10 maybe it was 15 percent disenrolled.  But a disenrollment is

11 after the application was accepted and then the person

12 disenrolls.

13     On the left-hand side, that's what the plaintiffs

14 ignored.  And the evidence is overwhelming on the overwhelming

15 dollars that Parker issued to the agents for which it never

16 received money back.

17     Mr. White testified in his deposition, Exhibit 7 of our

18 brief at 54-55, that in the first few years 50,000 applications

19 for years for which Parker issued checks to the agents were

20 rejected by the carriers.

21     And 30 percent, Exhibit 10 of our brief shows that 30

22 percent for Humana for one year were rejected by Humana, meaning

23 they never went into effect, they never could be disenrolled.

24     And Mr. Parker -- excuse me, Mr. White stated in his

25 affidavit that to this date, despite Herculean efforts at

1  reconciliations, Parker & Associates' books show that they have

2  issued $8.5 million more in commissions to agents than it has

3  received from the carriers.

4      THE COURT:  So Parker is losing money on this deal?

5      MR. FELDMAN:  That is absolutely correct, your Honor.

6  And I believe the evidence is undisputed on the item.

7      Now, rather than believe my witnesses who testified

8  under oath, under penalty of perjury, what about the plaintiffs'

9  own testimony on this subject?  Mr. Cowden, one of the named

10  plaintiffs, testified at Pages 83 and 201 to 204 of his

11  deposition, Exhibit 4 to our brief, that there are agents that

12  can owe Parker money.  He admitted that.

13      And he also stated at Page 170 of his deposition, quote

14  -- this was an e-mail that he sent while he was employed by

15  Parker, but an e-mail that he sent which was truthful.  Quote:

16  The money you've paid is money Ken Parker advanced all of us

17  with bank loans, a lot he hasn't seen a dime of.

18      Now, that's what one of the named plaintiffs said to one

19  of his agents, admitting that Parker has advantaged monies.

20      Now, interestingly, in plaintiffs' excellent

21  presentation, plaintiffs' counsel stated that the agents didn't

22  always get their money.  And that's the key point.  Whether it

23  happened or whether it didn't, whether it was more or whether it

24  was less is highly individualized, and there is no uniformity

25  whatsoever.

1      And what's the best example of that?  The <u>Daniels</u> case.

2  Your Honor, plaintiff says in their reply brief that you

3  shouldn't really look at the <u>Daniels</u> case or give it very much

4  weight because, according to plaintiffs, the issue there was

5  whether there was a release, not whether Parker owned money to

6  Daniels or <u>Daniels</u> owed money to Parker.

7      But that's because the issue of who owed who money was

8  one of summary judgment by Parker, and plaintiff elected not to

9  appeal that issue to the Court of Appeals.

10      So there were two issues.  Who owed who money, issue

11  number one in <u>Daniels</u>; second issue, should there be a

12  declaration or a release?  Parker won summary judgment on both,

13  but plaintiff only appealed the second issue.

14      And if I may, your Honor, I got have the trial court

15  opinion that's Exhibit 21 of your memorandum, and I'd just like

16  to cite a couple items from that, because <u>Daniels</u> is the perfect

17  example of an agent who thought he was owed money.  And after

18  six dispositions, 50 interrogatories, a thousand pages of

19  documents produced, and several affidavits, the verdict of the

20  trial court is that the agent owed Parker money.

21      On Page 2 of the trial court opinion, this is the

22  opinion of the trial court, the trial court notes that plaintiff

23  advanced unearned commissions.  So they note this advance of

24  commissions.

25      They also note that this results in charge-backs,

1    meaning that there's money owed by the agents to Parker.  And it

2    talks about agreements for leads and expenses.

3          Then on Page 3 of the opinion, the trial court states,

4    quote:  The plaintiff indicated his disagreement with Parker's

5    accounting.

6          Plaintiff keeps talking about commission grids,

7    commission grids, commission grids; but there's always going to

8    be or often going to be a disagreement over the underlying

9    figures, and there was in the Daniels case.

10          And then finally, at Page 7 of the opinion, the trial

11    court says the plaintiff argued at hearing that who owes who

12    money is highly disputed.  We're going to have 6,500 of those

13    highly disputed hearings if class certification is granted in

14    the case.

15          THE COURT:  But Ms. Wyrick says that there wasn't any

16    money in the escrow account.

17          MR. FELDMAN:  I'm sorry, your Honor?

18          THE COURT:  Ms. Wyrick said that Parker failed to

19    maintain its escrow account, if I understand what you're saying

20    correctly.  There wasn't any money in the escrow account.

21          MR. FELDMAN:  But the question is -- your Honor, I

22    believe the relevant question is:  Who owes who money?  In

23    Daniels, Mr. Daniels stated that Parker owes him $3,000.

24    Parker's documentation showed that Mr. Daniels owed Parker

25    $24,000.

1    The trial court granted summary judgment for Parker,

2  finding that there was no evidence to show that Parker owed any

3  money to Mr. Daniels.  So whether there's money in an escrow

4  account or not, there is money -- albeit it's all liens -- at

5  Parker & Associates.  And the question becomes:  Does any

6  individual agents have any entitlement to some of that money, or

7  does Parker have entitlement to money from an agent?

8    THE COURT:  The things is, Humana or whatever company is

9  paying all of this money to Parker & Associates, and it holds it

10  in an escrow account, theoretically.  Then it issues a credit,

11  is that right?  And if it owes the agent money, it pays the

12  agent money.  If it looks back and sees, "Well, wait, they owe

13  use for E&O, they owe us for mail, they owe us for this," and

14  then they would give the balance to the agents.  Is that how it

15  worked?

16    MR. FELDMAN:  Not quite, your Honor.  Here is how it

17  works.

18    At the beginning of the program, Parker would pay out

19  100 percent of the commission to the agent.  And then, as I

20  said, often 30 percent, or 50,000 applications, a year were

21  rejected.  So Parker would be out that money.  Then

22  thereafter --

23    THE COURT:  Then how --

24    MR. FELDMAN:  I'm sorry?

25    THE COURT:  Excuse me.  Then how did they get their fees

 1    for mail and E&O?  Did they collect that by separate check?

 2           MR. FELDMAN:  The E&O fees work like this.  Parker would

 3    issue, would pay for it.  And then it would -- when the

 4    commissions came in, to the extent the accounting worked, it

 5    would deduct that amount that was being paid to the agent.

 6           But if I can answer your prior question, your Honor,

 7    just to be complete and forthright.

 8           THE COURT:  Okay.

 9           MR. FELDMAN:  After a certain number of years Parker

10    first withheld 10 percent and then later 20 percent of the

11    commission amounts, recognizing that it was out millions and

12    millions of dollars.  But even with those holdbacks, Parker is

13    still short $8.5 million to this day.

14           Now, your Honor, I think the Daniels opinion is the

15    perfect example of why you'd have to have individualized

16    hearings.  And if I may, the appellate court hearing is also

17    enlightening.  That's Exhibit 23 of our opposition to class

18    certification.

19           Because the appellate court, like the trial court in

20    Daniels -- this is the appellate court in the state of

21    Mississippi -- noted that there were agreement s to advance

22    commissions and that there were charge-backs.  And then it

23    notes:  "Daniels maintained that he did not owe any money to

24    Parker.  Parker maintained that Daniels owed it $24,000."

25           It then also notes what will happen in this courtroom,

1   if I may, respectfully, your Honor, because it notes that --

2   excuse me one second: "A paralegal at Phelps Dunbar, a law firm

3   hired by Daniels, contacted Parker and informed them that

4   Parker's records did not match Daniels' records."

5         So you may have commission grids, but if the records

6   don't match each other you are going to have disputed issues of

7   fact as to whether an agent is owned money or an agent owes

8   Parker money.

9         Also, Footnote 2 --

10         THE COURT: From what you're telling me, there is no way

11   that Parker owes anybody any money, because it's short and the

12   agents never made them any money.

13         MR. FELDMAN: Your Honor, if I may, just because Parker

14   is owed $8.50 million, that does not mean every single agent

15   owes Parker money, to be completely forthright with this Court.

16   It means in the aggregate Parker is short $8.5 million.

17         Also, Footnote 2 of the Court of Appeals' opinion, your

18   Honor, is the footnote that says that the issue of who owes who

19   money was not appealed by the plaintiff, which is why at the

20   appellate level only the release issue was there.

21         Now, your Honor, I want to talk for a minute if I can

22   about the factual variation, about the individualized evidence

23   that the Court would have to look at to resolve this case. And

24   again, going back to the legal standard, is there one set of

25   evidence? Does trying this for Cowden and Biddle's case, would

1   that evidence bind the whole class such that you don't need

2   individualized evidence, or not?

3      To begin with, <u>Daniels</u> is the perfect example.

4   Plaintiffs aren't going to say that there should never be a

5   trial for Cowden and Biddle, but <u>Daniels</u> brought the case for

6   Cowden and Biddle and lost.  But Cowden and Biddle still have

7   a due-process right to put on their case.

8       It's also in the record in this case, your Honor, in the

9   attachments to the venue briefs where plaintiff attached

10  correspondence between Parker's counsel and plaintiffs' counsel,

11  trying to reconcile who owed who money.  So there's no agreement

12  on Cowden and Biddle as to whether they owe money to Parker or

13  Parker owes money to them.

14      Another good example of factual disputes, where you

15  can't have uniform evidence to try to decipher the accounting

16  and liability issues.

17      If I may, your Honor, plaintiff spent a decent amount of

18  time in their briefs citing a couple of cases which stated that

19  when damages are individualized then that is not a bar to class

20  certification.

21      But, your Honor, that only happens when damages are

22  formulaic.  For example, they cite one case, the <u>Smilow</u> case

23  from the First Circuit.  They cite that at Page 6 of their

24  brief.

25      And <u>Smilow</u> says -- and it's their case -- that there was

1    a computer program available to determine the amount of damage.

2    So I would agree, if all you need is a computer program, then

3    the fact that damages can change from person to person is not a

4    bar to class certification.

5         But the Sixth Circuit and other circuits are very clear;

6    that if damages requires the resort to individualized evidence,

7    then it is a bar to class certification.

8         If I may, your Honor, one more handout.

9         THE COURT:  Very well.

10        MR. FELDMAN:  We note first the Rodney v. Northwest

11   opinion from the Sixth Circuit in 2005.  And I'm only on the

12   first paragraph, where the Sixth Circuit said, quote:  Class

13   treatment may not be suitable where the calculation of damages

14   is not susceptible to a mathematical or formulaic calculation.

15        The Sixth Circuit said it again in Coleman v. General

16   Acceptance in 2002.  I'm at the very bottom of the first page.

17   Quote:  The individualized determinations necessary to calculate

18   the amount of damages each class member would be entitled to

19   eliminates the efficiencies created by adjudicating these claims

20   on a classified basis.

21        Your Honor, we then provide -- I don't need to read other

22   quotations -- numerous citations from the Eastern and Western

23   Districts of Kentucky, and then we give you examples from

24   other Circuit Courts.  In fact, we give you 26 cases here

25   where federal courts across the United States, including the

 1    Sixth Circuit, including this federal courthouse, have ruled

 2    that when deciding whether someone's been damaged and in

 3    deciding the amount of damage requires the resort to

 4    individualized evidence, then that alone is enough to defeat

 5    23(b)(3) predominance.

 6         That's very different than if there is a formula or a

 7    computer program that can determine the amount of the damage.

 8         Now what I'd like to do, your Honor, is look at a couple

 9    of examples of why individualized evidence would be necessary

10    here.  I'd like to start with just a couple of examples

11    regarding this.

12         I have another handout, if I may, your Honor.

13         THE COURT:  You may.

14         MR. FELDMAN:  So this is a chart that we put together

15    that summarizes some of the individualization.  Now, this is

16    just renewals.  Plaintiffs also have claims for commissions and

17    overrides, but let's just deal with renewals if we can now.

18         The left-hand box says "When does the claim start?"

19    because it's oral.  Mr. Biddle and Mr. Cowden both admitted in

20    their depositions that they were told orally when renewals would

21    start.  Mr. Cowden stated that at Pages 30 through 35 of his

22    deposition, Mr. Biddle at Pages 26 and 46 of his deposition.

23         Now, that's a critical item, because you can have all

24    the commission grids in the world you want; but if there's a

25    disagreement as to when renewal starts because it was an oral

1    conversation, you are going to have individualized, disputed

2    evidence with witnesses for each and every one of the 6,500

3    putative class members.

4         And Mr. White's affidavit states that the nationals told

5    the agents when renewals would start at various times between

6    2005 and 2006.  So there's no dispute it's oral when it starts,

7    and there's no dispute that there's different times as to when

8    it was told it would start.  And I would submit, your Honor,

9    there's no dispute that there will be disputes as to what was

10   stated orally.

11        But the second item of individualized evidence is the

12   second bracket on this chart:  When did they cease?  They don't

13   always cease, that's clear.  But the evidence is undisputed, and

14   it's in Mr. White's affidavit, that renewals often ceased when

15   an agent was no longer licensed or when an agent was not

16   recertified.

17        And even there it's more individualized, because Humana,

18   for example, began seeking renewals for lack of licensing two

19   years ago, but CIP did it in 2009.  CIP to this day will still

20   allow renewals if there's no recertification.  Recertification

21   is different than licensing.  Recertification means are you

22   certified to sell this particular product, as opposed to do we

23   have a license in the state to sell any product.

24      So CIP to this day will -- will not allow for recert- --

25   renewals on recertification, but New Horizon does.  So

1   there's even more individualization there in terms of when

2   renewals cease.

3         But then what about the amount?  The amount of renewals

4   varies by carrier, by year, and by region; and even by carrier,

5   by year, and by region, it varies depending where you are in the

6   hierarchy.  And we cite in our papers where that evidence is.

7         So if you would be kind enough to turn to the second

8   page of this handout, what we have done is map out just a couple

9   of examples with blue and yellow.

10         So in Example No. 1, let's call that Agent No. 1,

11   suppose that agent was told his renewals will begin in February

12   of '05.  But then suppose he was no longer licensed, going up

13   the ladder, no longer licensed.  Suppose he was told he was no

14   longer licensed at the beginning of '06.  He would never be

15   entitled to a renewal.  His renewals would never be entitled to

16   him.

17         Now, you can have all the commission grids you want, but

18   they're not going to help on this.  They're just not going to

19   help.

20         But let's take the same agent could have sold other

21   policies -- now we are taking the blue line down on the

22   left-hand side -- that were legitimate.  He was certified and

23   they came through, and he may have an entitlement to some

24   renewals.  But note they can vary -- the amount can vary by

25   carrier, vary by region, and vary by where you are in the

1  hierarchy.

2      Now take Agent No. 2, that's the yellow in the bottom.

3  Suppose that agent was told in June of '06 that his renewals

4  could start then.  And his sales are good, he's not stopped by

5  recertification, but it still varies by year and varies by

6  hierarchy.

7      So again, they are going to need individualized evidence

8  for each agent regarding renewals; when they were told they

9  would start orally, and all the variations with whether they

10 ceased or not and the varying amounts.  That's just renewals.

11 The same thing applies to commissions and overrides.

12     THE COURT:  So are unlicensed agents eligible to receive

13 commissions but not renewals?

14     MR. FELDMAN:  Well, an unlicensed agent, if that agent

15 was unlicensed at the time of the sale, we would have advanced

16 the money.  We got no money from the carrier.  If the agent was

17 licensed at the time of sale but then was unlicensed later on,

18 depending on the carrier -- some carriers would still issue

19 renewals, some would not.

20     THE COURT:  What measures did Parker & Associates take

21 to be sure it was marketing a product through licensed agencies?

22 Wouldn't that be part of its responsibility?

23     MR. FELDMAN:  Your Honor, it's a very good question.

24 This question comes up in almost all insurance class actions.

25     Agents are responsible for their own licensing.  I'm not

1  aware of any insurance company that goes to the 50 state

2  insurance regulators and checks up on its agents every year.

3       So at some point, the system has to work based on an

4  expectation of honesty.  So when an agent says they are

5  licensed, insurance companies accept that.  It can happen that

6  they lose their items that and still sell.  And it happens for

7  all insurance companies and, frankly, all products.  It

8  shouldn't, but it does.

9       THE COURT:  What percentage of agents does it represent

10  in a case like this?

11       MR. FELDMAN:  Your Honor, I don't know the answer to

12  that question, I'm sorry.  What I do know is that in the initial

13  years 50,000 or so applications were rejected, comprising about

14  30 percent of the apps.

15       THE COURT:  But applications could be rejected for other

16  reasons besides the lack of licenses on the part of the agents?

17       MR. FELDMAN:  That is correct, your Honor.

18       THE COURT:  The eligibility of the insured would be

19  primarily most of them, won't it?

20       MR. FELDMAN:  I think that's probably right.  Or the

21  application wasn't signed, the application didn't have the right

22  application, there was no ID number, things of that matter.

23       Your Honor, I have one other example, and then I will

24  move on to legal variation.  This deals with individualized

25  evidence for expenses.

 1       If I may approach, your Honor?

 2       THE COURT:  You may.

 3       MR. FELDMAN:  Now, the box on the left-hand side says

 4  "Possible reimburse," question mark.  Why is that a question

 5  mark?  Because contracts dating back to 2005 expressly state

 6  that agents are responsible for expenses and that they'll pay

 7  for leads and they'll pay for mailings and they'll pay for E&O

 8  insurance.

 9       Mr. Biddle admitted that at Page 48 of his deposition

10  where he says, "I do have documents that I signed that state I'm

11  responsible for lead costs."

12       Now, Mr. Cowden states and plaintiffs have taken the

13  position that some of those contracts only apply to a final

14  experience and burial insurance and not to health.  There's a

15  disputed fact issue, and there will be extrinsic evidence that

16  changes from class member to class member on what the intent of

17  those old contracts are.

18       But Mr. Cowden admits in his deposition expressly that

19  he had a contract dated April of 2007.  That's Exhibit 5 -- the

20  contract -- to our papers, which overtly states that he's

21  responsible to pay for mailings, E&O insurance, and leads.

22       And Mr. Cowden took the position in his deposition,

23  "Well, that means that I was responsible for those costs as of

24  April of '07 going forward, but not necessarily going backward."

25  That's his position, but he admits that he was responsible for

1  those costs at least from April on.

2          So that's why we have a box, "Possible reimbursement"

3  question.

4          Next, you get to the expenses themselves, the leads.

5  The evidence in the record shows that oftentimes they're reduced

6  or even waived.  That's the White deposition at 85-86 and the

7  White affidavit in Paragraph 13.

8          Exhibit 11 to our papers, at Page 26, identifies that

9  sometimes there's no charge for leads at all, and then the lead

10  amount itself that's charged varies by promotional campaign, by

11  performance, and by region.

12          Finally, we got to mailings.  And mailings themselves,

13  the amount charged, varies by national organization, time, and

14  whether it's commercial or residential.

15          And again, on the second page I map out a couple of

16  potential examples to illuminate why individualized evidence

17  would be necessary for each and every one of the putative class

18  members.

19          So on the second page, we've got the blue, the orange,

20  and the green.  Let's call blue Agent No. 3.  We had Agents 1

21  and 2 on the prior example for the renewals.

22          So the first example, Agent No. 3 in blue, is no claim.

23  Why?  Because his company -- he sold -- or he or she sold after

24  a point in time when a contract overtly said, "You are

25  responsible for these costs."  No claim.

1    But that evidence has nothing to do and can't bind Agent

2  4 in yellow, because Agent 4 in yellow did make some sales, and

3  then the leads were either reduced or waived or the lead amount

4  would vary by promotional campaign and the lead amount itself

5  would vary by national organization.

6    But the evidence available to the agent in yellow has

7  nothing to do with binding the agent in green, who may have --

8  who made some sales and arguably has a claim for the amount, but

9  the amount would vary by performance or vary by region.  That is

10  the amount that was charged.

11    Now, one important point on expenses that I think should

12  not get lost in the mix, your Honor, is that Parker pays these

13  monies.  In fact, Mr. Cowden in his deposition admitted that the

14  leads were valuable.  He stated at Page 137, "Parker &

15  Associates is fairly effective at marketing and providing leads

16  and, in general terms, in advancing commissions."  That's what

17  Mr. Cowden stated under oath.

18    So there's value to the leads.  The question is:  Is

19  Parker entitled to get that money back or not?  That's a

20  question of when did the contract start, how do you interpret

21  the contract, and the varying costs of the leads that vary by

22  region, carrier, campaign, and so forth.

23    THE COURT:  When you say "campaign," what do you mean?

24  Do you try to run a campaign through an organization somehow,

25  run a special, or what?

1        MR. FELDMAN: Yes, your Honor. There are so-called

2 promotional campaigns. Again, this is generic in the insurance

3 industry, and Parker is no exception. There will be, quote, it

4 may not be the best word, a campaign. And then there are

5 incentives to the agents that costs may be reduced. So you

6 could have hypothetically -- and I don't have the evidence of

7 this in front of me -- have a campaign and say during this time

8 period the cost of leads is reduced, or during this time period

9 leads are free. And that happens with all products in the

10 insurance industry.

11        THE COURT: When you're talking about Medicare, you're

12 talking about a government program. And doesn't everybody

13 automatically have Medicare Part A?

14        MR. FELDMAN: Yes.

15        THE COURT: Everybody over 65, right?

16        MR. FELDMAN: And I am getting very close, and I'm

17 counting on it.

18        THE COURT: So I don't understand the benefit of leads

19 to a Medicaid market. I mean, if you target -- I mean, you can

20 you go down to the public records and find out who's over 65, or

21 go through church records, or go through -- or send an ad and

22 advertise in senior citizens' magazines and so forth.

23        I don't understand the relevance of leads in a fixed

24 market which is Medicare, and you are offering something free.

25 How do you discount something free to increase a customer's

1    interest in the product?

2         MR. FELDMAN:  Your Honor, it's an excellent question.

3    It goes to the fundamental nature of this marketplace for

4    Medicare Advantage.  There's lots of policy debates.  You can

5    Google it and find all kinds of articles about whether Medicare

6    Advantage is good or bad, depending on where you fit in the

7    political spectrum.

8         The reality is that this was touted as a more efficient

9    way to provide Medicare services, so-called partial

10   privatization of Medicare.

11        And so the companies, as soon as the federal government,

12   through Congress, allowed it, the carriers dived in head first.

13   They said, "Wow, here's a whole new area where we can market

14   ourselves.  We already have our preferred provider network where

15   we sell to people under 65.  Let's now market.  Congress said we

16   can do it, Congress said they want us to do it.  So now let's

17   use our existing preferred provider network and market Medicare

18   Advantage.  And it can be good for the consumer.  They'll have a

19   nice network to work with.  It could be good for us as carriers.

20   We may or may not make more money."  So all the carriers dived

21   in.

22        Companies like Parker and other brokerage houses, or the

23   entities themselves -- the Humanas -- that could sell it through

24   their agents then wound up selling.  And when an agent can get a

25   commission, I think you can see what happened.  The sales really

1   took off.

2       THE COURT:  I guess it goes back to my question of, does

3   this lead business really provide anything to the agents?  You

4   said the deposition testimony indicated that it did.

5       MR. FELDMAN:  It did.

6       THE COURT:  And I'm just having a difficult time

7   imagining why it does.

8       MR. FELDMAN:  I misunderstood your question.  My

9   apology, your Honor.

10      It does, for this reason.  To the agent, it's about

11  sales, because agents make money -- insurance agents make money

12  on the commissions.  A lead is telling you that in the area

13  Agent A is selling in, here is a potential customer based on

14  demographics, based on other purchases they have made, so on and

15  so forth.

16      So how do you find out who your potential customers are?

17  By getting leads.

18      Have I answered your question, your Honor?

19      THE COURT:  Yes, but if Humana already provides Medicare

20  services to a customer, why does it need to give an agent a lead

21  on information that it already has?  Couldn't it just direct

22  market?  I mean, what is the purpose of all of this?

23      MR. FELDMAN:  There is direct marketing.  But the lead

24  is more than the agent -- the prospective customer is over 65.

25  The leads are based on purchasing patterns, other information

1  that's available in the marketplace.

2  And so the lead is supposed to be a good prospect; not

3  just someone over 65, but someone over 65 based on information

4  showing potentially good prospect for this product.

5  THE COURT:  And how are the charges for those leads

6  calculated by Parker?

7  MR. FELDMAN:  Your Honor, at times they were free.  At

8  times, Parker calculated them to receive back the cost it had

9  expended.  So it might be an X dollar amount per lead, knowing

10  that it's expending a large amount of resources to find those

11  leads.

12  Or sometimes Parker purchased them from other sources

13  and then passed those costs on.  The leads just don't come from

14  nowhere.  It's a large expenditure of dollars to get or to

15  develop the leads.

16  THE COURT:  Were agents ever told in advance what the

17  cost of getting these leads would be, or was it just calculated

18  after they were given?

19  MR. FELDMAN:  Your Honor, I don't have the cite in front

20  of me.  I'm sure I can get it for you.  But there are some

21  documents that identify amounts, there are some that don't.

22  THE COURT:  Okay.

23  MR. FELDMAN:  With the Court's permission, I'd like to

24  move on to legal variation, but I certainly don't want to

25  foreclose any other questions, your Honor.

1    THE COURT:  No, some of it just satisfied my own

2  curiosity.  It's a business model I don't understand.

3    MR. FELDMAN:  Your Honor, it took me some time to

4  understand it, as well.

5    THE COURT:  I think if the taxpayers knew about it they

6  would probably scratch their heads, but please proceed.

7    MR. FELDMAN:  Plaintiffs' counsel mentioned in her

8  presentation that this Court is free to apply Mississippi law

9  nationally.

10    I might add that that argument is really an appositive

11  phrase that's in their brief.  It's not something that they have

12  case citations for.  I would add at a macro level that the

13  plaintiff did not provide this Court with a 71-page legal

14  appendix going through the 50 state laws if they truly believed

15  that Mississippi law could be applied nationally to end run the

16  conundrum of legal derogation.

17    THE COURT:  But I think your client would be arguing

18  that Mississippi law should apply.

19    MR. FELDMAN:  Not nationally, no; no, not at all, your

20  Honor.  We do not take that position and have never taken that

21  position.  We did ask this Court, respectfully, to transfer the

22  case to Mississippi, because that's where we felt the witnesses

23  and the evidence was.  Your Honor respectfully disagreed.

24    But we have never taken the position that Mississippi

25  law should apply nationally, and it can't, and I would like to

1    explain why.

2         THE COURT:  Okay.  Just to be clear, if I don't certify

3    this class and it proceeds with just the individual plaintiffs

4    here, are you going to ask me to apply Kentucky law or

5    Mississippi law?

6         MR. FELDMAN:  Kentucky.  Your Honor, Kentucky law would

7    have to apply to the named plaintiffs here.

8         Your Honor, the best evidence on why the law of the 50

9    states has to apply really stems from plaintiffs' memorandum in

10   opposition to the motion to change venue.

11        But if I may, just a quick overview on what the standard

12   is.  I think we all are familiar with it.  But the <u>Sigg</u> opinion

13   and the <u>Corder v. Ford Motor</u> opinions that we cite in our brief

14   identify the standards for choice of law.

15        And those opinions essentially state that for tort you

16   look to where the injury occurred if you want to conflate the

17   factors down.  And for contract, you look to where the contract

18   was entered into, the place of negotiation, and the place of

19   performance.

20        Well, what did plaintiffs' counsel state, correctly,

21   citing to the affidavits from Cowden and Biddle and their

22   memorandum in opposition of transfer?  In Page 4 of the brief,

23   they said, quote:  Defendants recruited agents, promised

24   payments of commissions and renewals, and trained agents on

25   payment commissions and renewals all over the country.  End

1  quote.

2  On Page 5, plaintiffs stated in their opposition to

3  transfer, quote:  All of the paperwork involved was securing

4  insurance for the aforementioned MA Plans was completed by

5  Biddle in either Kentucky or Ohio, never in Mississippi.  End

6  quote.

7  Now, Mr. Biddle, in his affidavit to the opposition to

8  venue, which is in the record, stated in Paragraph 19 that the

9  documents he signed at Parker would have been signed in Kentucky

10  or Ohio.  He states, quote:  I never signed any documents in

11  Mississippi.

12  And Mr. Cowden, in his affidavit, which is an exhibit to

13  plaintiffs' memorandum in opposition to venue, noted that he was

14  a regional manager for Kentucky, Indiana, Illinois, Ohio, and

15  Tennessee, and he said that the Parker representatives would

16  travel to their agents in those states.

17  So to go back to the test, where did the alleged term

18  occur?  Well, if you were recruited in Kentucky, Tennessee, New

19  York, or Illinois, if you were trained in Kentucky, Tennessee,

20  New York, or Illinois, and if the sales occurred in those

21  states, in almost all the states; clearly, the injury occurred

22  in those states.  You have to apply the law in those states.

23  Breach of contract, if the contracts were entered into

24  in all those states, which is what plaintiffs' affidavits say,

25  if the paperwork was entered into in all of those various states

1  and the sales were made in all of those various states, you have

2  to apply the law of the 50 states. There's just no way around

3  it.

4       Now, I'd like to take a look at what that would look like

5  in terms of a jury instruction. First, I'm going to deal

6  with the fraudulent misrepresentation issue. Again, if I may

7  approach the Court?

8            THE COURT: You may.

9            MR. FELDMAN: Now, one of the arguments plaintiffs made,

10  both in their brief and this afternoon, was that the differences

11  in the legal variation elements could be dealt with in

12  subclasses. And your Honor astutely said, "How many?"

13       Well, let's just take a look at fraud, fraudulent

14  misrepresentation. Let's look at the bottom left-hand side of

15  the first page. Whether the plaintiffs have to prove a

16  preponderance of the evidence or clear and convincing evidence

17  is a huge difference to a juror.

18       How does a juror, in his or her mind, apply

19  preponderance of the evidence for one plaintiff in one state and

20  clear and convincing evidence for another putative class member

21  in another state? It just can't be done.

22       Turn to the second page, degree of culpability. In some

23  states, you need to have actual knowledge of the falsehood; in

24  other states, it's recklessness. Again, that's a major

25  difference. And the subclasses just continue and continue.

1      Go to the next page.  The reliance element for

2   fraudulent misrep, in some states it's actual and some states

3   fraudulent reliance.  Again, no juror in their head could apply

4   actual reliance in some states for some putative class members

5   and justifiable reliance for others.

6      Look at the number of elements on the next page; it's

7   all over the map, three elements to nine elements.

8      But, your Honor, the most important page is the last

9   page because that's where I put the elements together.  If you

10  look at the very last map, it's all over the map because the

11  elements as applied by the states are all over the map.

12     That's why the federal court in Chin v. Chrysler, which

13  we cited in our paper, said, quote:  No Court has tried a class

14  action which would require the application of the laws of the 51

15  jurisdictions, unquote.

16     And that's why the Sixth Circuit, quite eloquently, in

17  In re Medical -- American Medical, 75 F.3d 1069 to 1085, the

18  Sixth Circuit in 1996 said -- and it's an item, a sound bite

19  that's quoted all across America.  Quote:  If more than a few of

20  the laws of the 50 states differed, the District Judge would

21  face an impossible task of instructing a jury on the relevant

22  law."

23     The Sixth Circuit just a year ago, or in 2011, in

24  Universal Health affirmed the striking of a class allegation

25  because the class involved the common law of the 50 states.

1   Now, that's just fraudulent misrep.

2        Next, promissory estoppel.  If I may approach?

3        THE COURT:  You may.

4        MR. FELDMAN:  Your Honor, I don't want to belabor the

5   various elements, so let's just go to the last page, given the

6   time.  I have gone longer than I said I would.

7        If you look at promissory estoppel, all the issues,

8   again, you can't instruct the jury.  And I would just note that

9   for the reliance element alone, for some states it's reliance

10   without qualification, for other states it's detrimental

11   reliance.  Again, how could you instruct the jury with all these

12   different subclasses?  So that's promissory estoppel.

13        And by the way, in our papers we cite cases where

14   federal courts have denied class certification based solely on

15   legal variation based on promissory estoppel.

16        Next is conversion.  Again, I just want to hand this out

17   to the Court.  I'm not going to spend any time on it.

18        If I may, your Honor?

19        THE COURT:  You may.

20        MR. FELDMAN:  Again, if you'll be kind enough just to

21   turn to the last page, I don't want to take extra time with the

22   various elements.  They're identified.  You'd need, again, five

23   to six to eight to ten different subclasses, just for

24   conversion.

25        If you look at conversion, all of the issues, it's all

1  over the map in terms of how the states apply the various

2  elements.

3      And again, we cite in the papers in our opposition to

4  class certification cases that have denied the class

5  certification under Rule 23(b)(3) because of the legal variation

6  just of conversion. It's in our papers.

7      I'm not going to speak to these -- again, I'm over

8  time -- but I would like to hand out the same charts, if I may,

9  for breach of contract.

10     THE COURT: You may.

11     MR. FELDMAN: And for unjust enrichment, so the Court

12  has it.

13     I think the breach of contract -- just 30 seconds -- is

14  interesting. Because when you have oral contracts as to when

15  renewals started and you have disagreement over the meaning of

16  written contracts, when payment of leads and expenses would

17  start, you're going to have to deal with the issues of what kind

18  of extrinsic evidence can be permitted, what's the test for

19  determining conflicting meanings of contracts. And the law is

20  all over the map.

21     And again, in our papers in opposition to class

22  certification, we cite for the Court's benefit cases that have

23  denied class certification based solely on the legal variation

24  from the common laws of the 50 states on breach of contract and

25  specifically on extrinsic evidence.

1      So in sum, your Honor, in order for this Court to

2   certify this class the Court has to be able to say, "Is there

3   one set of evidence that I can use to determine the outcome of

4   all of the class members?  Does trying this for Cowden and

5   Biddle's case end it and determine the outcome for everyone?"

6      And respectfully, I say it can't.  You've got oral

7   contracts.  You've got differing amounts of money.  You have

8   variations in the written contracts.  You've got variations in

9   the amounts that are charged.  You have variations in whether an

10   agent owes Parker money or Parker might possibly owe some agents

11   money.  The Daniels case is the best example.  He thought he was

12   owed money, and Parker won summary judgment.

13      But second, the Court would have to say, "Can I instruct

14   the jury?  Is there one set of jury instructions that I can give

15   that are comprehensible for the jury?"

16      Respectfully, I submit there's not.

17      THE COURT:  Thank you very much.

18      MR. FELDMAN:  Thank you.

19      THE COURT:  All right.  Ms. Wyrick, I'm sure you have a

20   response?

21      MS. WYRICK:  I do.  I will be brief.  I'll just take

22   these in kind of the order that Mr. Feldman was addressing them.

23      But initially we began with the discussion of

24   charge-backs, and Mr. Feldman admitted that a percentage was

25   withheld from initial commissions to account for charge-backs or

 1    policies that ultimately were not issued.

 2          And what he didn't say is that these amounts that were

 3    put in escrow, so to speak, were never actually put in an escrow

 4    account.  There is no separate escrow account, and agents never

 5    got money back from those accounts.

 6          With respect to his claim that Parker & Associates is

 7    losing money on this business, we disagree with that.  I mean,

 8    Mr. White has produced an affidavit stating that, but in our

 9    review of records it appears that insurance sales commission

10    income exceeded the insurance sales commission expense every

11    year.

12          With respect to the <u>Daniels</u> case, they cite that as an

13    example of why this would be inappropriate to try as a class and

14    an example of how it's going to be an individualized issue as to

15    determine who owes who money.

16          Well, we asked Mr. White that in his deposition as the

17    corporate representative for the Parker Companies, and the

18    Parker Companies had been performing reconciliations for the

19    insurance carriers that they work with.

20          As part of those reconciliations, they have been

21    breaking down what each agent is owed.  And he testified under

22    oath that those reconciliations had been done and it should not

23    be a problem to break that down agent by agent.

24          So it's simply --

25          THE COURT:  At the end of the day, they have to figure

1    out how much they owe every agent, don't they?

2              MS. WYRICK:  Absolutely.

3              THE COURT:  They wouldn't be in business otherwise?

4              MS. WYRICK:  Absolutely.

5              THE COURT:  So they are going to have to figure out the

6    charge-backs as to each agent over the 50 states based on the

7    individual agreements they have with each and every agent.  Is

8    that correct?

9              MS. WYRICK:  They will have to break it down as to every

10   agent.  They should have already done that, and we believe that

11   they have done that.

12             Mr. Feldman made a point that you would have to look at

13   when an agent was told his renewals would begin.  I think

14   perhaps he misunderstands the testimony from Mr. Cowden and

15   Mr. Biddle.

16             Mr. Cowden and Mr. Biddle did say they were told orally

17   when their renewals would begin.  The question was:  When was

18   Parker going to begin receiving their renewals so that they

19   could begin receiving their renewals?

20             Parker then admitted that they began receiving the

21   renewals, at least for the Humana and UHC commissions, and did

22   not pay the agents those renewals until 2006.

23             THE COURT:  But they did pay them, ultimately?

24             MS. WYRICK:  Not -- only after a point in time.  There

25   are certain years that they are now taking the position that

1  they said they would not pay and did not have to pay.  That's a

2  classwide issue.  That does not vary from agent to agent.

3        THE COURT:  But that really wasn't Parker's fault that

4  Humana wouldn't pay its commissions?

5        MS. WYRICK:  No, Humana --

6        THE COURT:  If Humana wasn't paying Parker, Parker

7  couldn't pay its agents.

8        MS. WYRICK:  I think the question was whether there was

9  going to be a renewal commission structure as part of this

10  agreement.  Once Humana said that there was and that there would

11  be renewal commissions, those renewals were supposed to be

12  passed on to the agents.

13        THE COURT:  Okay.

14        MS. WYRICK:  Mr. Feldman cited some cases saying that

15  this cannot be certified as a class because of the

16  individualized question of damages.  Cases are legion finding

17  that individualized damages are not a bar to certification.  He

18  said he cited 26.  I'm certain I can find you more than 26,

19  easily.

20        The Messner case that we cite in our brief, there the

21  trial court had denied class certification based on the damages

22  issue.  In the Messner case, the Seventh Circuit held that the

23  degree of uniformity for damages that the trial court was

24  requiring was simply not an element of Rule 23.

25        The Sixth Circuit, in Whirlpool, said no matter how

1   individualized damages are, that can be determined in an

2   individual proceeding and you can determine the issue of

3   liability.  And liability is what I think can be determined here

4   on a classwide basis.

5        THE COURT:  So are you suggesting that we have a class

6   action for purposes of liability and decertify for purposes of

7   damages?  How do you suggest we handle the issue of damages?

8        MS. WYRICK:  I think the issue of damages can be handled

9   in a separate proceeding when the parties have gathered the

10  evidence and performed these reconciliations that supposedly

11  have already been performed.

12       But at that point, we should know the issue of did

13  Parker fail to pay these renewal commissions?  Were they

14  rounding up and charging for mailing charges?  Were they

15  improperly charging errors and omissions insurance?  I think all

16  of that can be addressed in a classwide basis.

17       In the Coleman case that they indicated stands for the

18  proposition that the class should not have been certified

19  because of the damages issue, the Coleman case is a (b)(2) case.

20  We are not seeking certification under (b)(2).

21       And I think it's actually very hard to think of examples

22  of classes that have been certified where there aren't

23  individualized questions of damages, at least to some degree.

24       You can think of your typical wage and hour overtime

25  cases.  You may determine on a classwide basis that a certain

1    element should have been included in the overtime calculation,

2    but that doesn't prevent someone from having to do the work of

3    figuring out how much overtime each person worked and how much

4    overtime they are entitled to.

5         THE COURT:  But again, that wouldn't require an offset

6    calculation, which this may indeed require an offset in terms of

7    if there are legitimate charges -- and I'll refer to all of them

8    as charge-backs in terms of offsets for insurance, for mailing;

9    assuming they are all legitimate charges, we're going to have to

10   have an offset provision.  And wouldn't that vary from defendant

11   to defendant -- excuse me, from class member to class member?

12        MS. WYRICK:  There may be some variation, but we think

13   some of the elements that they are claiming offsets for they

14   would not be entitled to offsets.  I think we can make that

15   clear as we proceed.

16        For example, why should there be an offset for mailing

17   charges that have been repeatedly rounded up and admittedly

18   rounded up?

19        THE COURT:  But again, everybody got different mailings

20   that cost different amounts, and they were rounded up in the

21   amounts of pennies for mailing all over the United States.  And

22   I don't know if -- how would you calculate those damages in a

23   classwide basis?

24        MS. WYRICK:  They always rounded up to the next dollar,

25   it appears, so they had a standard way that they actually did

1   this.  But with regard to their claim that their expenses --

2   that some people had contracts allowing them to deduct expenses,

3   no one has a contract saying that they can be overcharged for

4   expenses.  No one has a contract saying that they can be

5   overcharged for mailing charges or errors and omissions

6   insurance.

7        You had asked a question about leads, and I think the

8   answer to that question here is that the Parker -- Mr. Parker's

9   wife owns 40 percent of Lead America that supplied the leads, so

10  I think that's why the leads were supplied and why they were

11  charged.

12       And finally, just to wrap up quickly, again, we do think

13  that Mississippi law can be applied to much of this.

14  Mr. Feldman suggested that we believed that that was not the

15  case because we performed that analysis, extensive analysis, in

16  our brief.

17       And I will tell you the reason that we performed that

18  analysis is because the cases require that we do so.  They

19  require that we make an effort to show that, in a nationwide

20  class, if -- if this is going to potentially go forward, you

21  must look at whether there's a potential of dealing with these

22  individual common-law claims in a classwide basis.  And we

23  believe that we've fulfilled that.

24       The elements that we have cited are essentially the same

25  from state to state.  Mr. Feldman has attempted to break them

 1  down on many occasions by citing this one requires three

 2  elements, this one requires five elements, this state requires

 3  seven elements.  And that is essentially meaningless.  You have

 4  to look at what the actual law requires; and I think, if you

 5  look at our analysis, you see that it's very much the same in

 6  most cases.

 7      If you have to deal with some different things like

 8  burdens of proof on a fraud claim, you can deal with that

 9  through three simple subclasses:  Clear and convincing evidence,

10  preponderance of the evidence, and whichever -- whatever other

11  burden of proof that there is.

12      But we have cited cases in our briefs where nationwide

13  classes have been certified on the issues of conversion, unjust

14  enrichment, and breach of the contract, and we think that that

15  would be appropriate here.

16      THE COURT:  Would we have to have three separate trials

17  if we had three different subclasses?  I think it would be

18  difficult to instruct a jury on three different burdens of

19  proof.

20      MS. WYRICK:  I don't think it would be three separate

21  trials, I think it would be three separate instructions; and

22  again, that's only for the misrepresentation claim.

23      THE COURT:  When it comes to misrepresentation and

24  fraud, I presume that most states would permit an allocation of

25  punitive damages.  Have you taken that into consideration as to

1  how that would be dealt with?

2       MS. WYRICK:  Again, I think that would be a separate

3  jury interrogatory instructing on what punitive damages were

4  allowed by the different states that allowed punitive damages.

5  But I think you feel that most cases do allow punitive damages

6  for fraud.

7       THE COURT:  All right.  Anything else?

8       MS. WYRICK:  That's all.  Thank you.

9       THE COURT:  Okay.  Let me look at my list of questions

10  here.  I think you've answered most of them.

11       Let's take about a 10-minute recess.  I have some

12  documents that I want to look at before I engage in further

13  questions.

14   (Recess taken at 3:00 p.m., resuming at 3:20 p.m.)

15       THE COURT:  Sorry to keep you waiting.  I just wanted to

16  think about this.

17       This case is a little bit unique in that most of the

18  time the parties are battling on every level of all elements of

19  the case, and we're really down to the 23(b) element.

20       It seems to me that what we are really looking for is

21  does a class action make sense, in that we provide an equitable

22  and just resolution in the most efficient manner.

23       And usually, what you see in these kinds of cases is

24  that you've got a large number of plaintiffs whose damages may

25  be relatively small.  And that's what I sense is the case here,

1    which sort of argues in favor of certifying the class; in that

2    otherwise, these people wouldn't have any meaningful course of

3    relief.

4         But I guess I'm concerned first of all about the

5    liability issue, in how I would structure a jury instruction

6    form.  For example, on the fraud, some have clear and convincing

7    evidence standards, others have preponderance of the evidence

8    standards.

9         It does seem to me that we could handle that, as

10   Ms. Wyrick points out, by just simply having the jurors check,

11   "Has this class proved it by a preponderance of the evidence,

12   clear and convincing evidence?"  If they only check

13   "preponderance," then only those subclass members who met the

14   preponderance standard in that state or whose state had a

15   preponderance standard would recover.

16        So I think we could handle the liability side of it

17   easily.

18        But I think Mr. Feldman makes a good point when we get

19   to the damages here.  Now, I want to be sure that I understand

20   something.  The mailing upgrades or the roundups, those were

21   standard.  That happened to everybody all the time; is that

22   correct, Ms. Wyrick?  I think, Mr. Feldman, you don't even

23   contest that, do you, factually?

24        MR. FELDMAN:  We do contest it.  In Mr. White's

25   affidavit, he states that there are mailings that are odd

1 numbers that he has examined. I can give you the cite for that,

2 the paragraph of his affidavit.

3 THE COURT: That's fine. I'll take that for purposes of

4 our discussion today. But even assuming that mailing was

5 standard, the leads clearly aren't standard. I mean, we've got

6 those all over the place. They didn't charge for some of them,

7 they charged a lot, it maybe looked like to me overcharged for

8 others, maybe charged accurately for others. In some instances

9 there's a question of whether they're entitled to them at all.

10 And so there you sort of have a blend of liability and damage

11 issues.

12 So I guess what I'm -- and Ms. Wyrick, I'm going to give

13 you a chance to respond to this. In terms of the calculation of

14 damages, you have each and every agent being owed a different

15 amount. Even if the defendant were willing to give them

16 everything they want, they're all going to be owed a different

17 amount.

18 If Parker is entitled to offsets for expenses that have

19 been incurred, every one of those is going to be different and

20 often disputed. Some agents may not have any damages.

21 And in some cases, although there's no counterclaim here

22 I notice against these two plaintiffs, there might be some cases

23 in which the insurance company would have a counterclaim, like

24 in the Davis case, and say "Actually, maybe you owe us money."

25 How would I handle those? That's what's really

```
1   concerning me.  I recognize that the case law says that I don't

2   look solely at that, but I think that I would be well supported

3   in the case law if I just found that this really makes it

4   impossible and that it stands as an impediment that we just

5   can't overcome in terms of handling this equitably and

6   efficiently.

7         So can you help me out on that issue?

8         MS. WYRICK:  I believe I can, because first of all the

9   damages issue, there are some overarching damages that

10  definitely apply to everybody.  For example, to the extent that

11  Parker is refusing to pay commissions for Humana and UHC,

12  renewal commissions, even though they received the commissions,

13  that's a simple matter.  That's not a question of whether

14  there's an offset or anything like that.

15        THE COURT:  Okay.  So these could just be managed by

16  simply identifying those insurance companies and setting forth

17  the requisite amount of commissions.

18        MS. WYRICK:  Agency sales of policies.

19        THE COURT:  Okay.

20        MS. WYRICK:  And in addition, there is certainly the

21  issues of Humana and UHC settlement monies that were never

22  credited in any way to any of the agents.  Again, that's a

23  uniform issue.

24        We also think that some of the upgrade charges, whether

25  it be for errors and omissions or mailing, are uniform issues,
```

1    but we understand the Court's concern.

2         One thing that kind of addresses that is Mr. White's

3    admission during his deposition, which was the corporate

4    representative deposition, that reconciliations had been done

5    for each carrier.  And theoretically, there's a computer

6    printout somewhere that can provide us what the agents are

7    allegedly owed.

8         THE COURT:  I mean, they couldn't stay in business if

9    they don't know what's owed them and what they owe other people.

10        MS. WYRICK:  Exactly, and they're still operating today.

11        THE COURT:  Okay.  All right.  Anything else?

12        MS. WYRICK:  No, that's all.

13        THE COURT:  All right.  Mr. Feldman, you see where my

14   area of concern is.  And as Ms. Wyrick points out, your client's

15   got this information.  Shouldn't it be pretty easy?  You are

16   going to have to do it in 20 pieces of litigation or one big

17   one.  Really, what's the difference?

18        MR. FELDMAN:  May I use the podium?

19        THE COURT:  You may, please.

20        MR. FELDMAN:  It's not.  And again, the Daniels case is

21   the best example:  Six depositions 50 interrogatories, a

22   thousand pages of documents, lots of affidavits.  Daniels said,

23   "You owe me $3,000."  Parker says, "You, Daniels, owe me

24   $24,000."  Pleadings filed, judgment for Parker.  It's not that

25   simple.

1        And if I may, your Honor, addressing your negative value

2   point that these are small -- could be small claims.  Many

3   states have fee-shifting statutes for consumer fraud.  In

4   addition, I think the law is pretty clear that, whether the case

5   has negative value or not, it can't change the constitutional

6   principles of class certification; in other words, you can't

7   bend a procedural requirement just because of a potential

8   negative value.  I think the law is pretty clear on that.

9        THE COURT:  Well, now, consumer fraud statutes would

10  only apply to the consumer of the insurance, so I don't think

11  agents under most consumer fraud statutes would have a cause of

12  action against Parker, would they?

13       MR. FELDMAN:  Your Honor, I think they would, but I

14  could be wrong.  I'm not sure --

15       THE COURT:  I'm just curious.  That wasn't a trick

16  question.

17       MR. FELDMAN:  I don't see why a broker would be

18  considered a consumer, but perhaps I'm wrong on that.

19       THE COURT:  Okay.

20       MR. FELDMAN:  And finally, on jury instructions, your

21  Honor; respectfully, I disagree that a special interrogatory

22  could do that, because the differences here are just -- are just

23  too great.

24       Also, if you are going to require the higher level of

25  burden of proof, that's not fair to persons who would have

1  prevailed with a lower level of burden of proof from other

2  states.  So the differences that we have given you are really

3  overwhelming in terms of potential interrogatories or

4  subclasses, in my judgment.

5  　　　　THE COURT:  But if the jury found only the lowest level

6  of burden of proof, then only those -- then everyone could

7  recover.  But if they required a higher standard of proof --

8  　　　　MR. FELDMAN:  No, I think it's the opposite, your Honor.

9  　　　　THE COURT:  You've got me backwards, yes.

10  　　　　MR. FELDMAN:  It is complicated, yes.  What if the jury

11  then doesn't find the highest level?

12  　　　　THE COURT:  Then those individuals would be precluded

13  from recovering.

14  　　　　MR. FELDMAN:  But that's not fair to the individuals who

15  might possibly recover with a lower level.  That's not fair to

16  them.  They might have an individual claim.

17  　　　　THE COURT:  But you would allow them to check both.  In

18  other words, we would give them a choice:  Have they proved it

19  by clear and convincing evidence, have they proved it by

20  preponderance of the evidence?

21  　　　　If they check preponderance of the evidence, then those

22  who failed to prove clear and convincing evidence would not

23  recover because the jury didn't so indicate.  If, however, they

24  checked preponderance of the evidence and clear and convincing

25  evidence, everyone recovers.

1    MR. FELDMAN:  But you're going to be applying that

2  checklist based on Cowden and Biddle.  And how can that apply

3  when the facts could be different with respect to other class

4  members from other states?  I don't see how that can be -- how

5  that can possibly work.

6       And then what do you do with reliance, and what do you

7  do with all the other differences in the causes and elements?

8  What do you do with the procedural issue of what extrinsic

9  evidence can you look at if a contract is ambiguous?  How do you

10 deal with the legal variation of what's the test to determine if

11 a contract is ambiguous?

12      If you look at the Bowers v. Jefferson case that we

13 cite, that Court denied class certification because of the

14 procedural differences among the states on what extrinsic

15 evidence to look at to determine whether a contract is ambiguous

16 or not.

17      THE COURT:  All right.  Thank you.

18      I have one last question for you, Ms. Wyrick.  What

19 damages are your clients seeking, Mr. Biddle and Mr. Cowden?

20      MS. WYRICK:  They were both denied renewal fees, and

21 they were charged errors and omission insurance improperly, they

22 were charged mailing charges improperly.

23      And of course, Mr. Cowden has agents in his hierarchy,

24 and he didn't receive renewal fees or renewal commissions on

25 those people.

1    THE COURT:  Okay.  Can you give me a ballpark figure of

2  what those amounts are?

3    MS. WYRICK:  We haven't done -- I hesitate to do that,

4  because we haven't done a complete analysis for each individual.

5    THE COURT:  Are we talking about more than $50,000?

6    MS. WYRICK:  Perhaps, with Mr. Cowden, who had a number

7  of individuals under him.

8    THE COURT:  Okay.  With respect to Mr. Biddle?

9    MS. WYRICK:  I'm not sure about that.

10    THE COURT:  Okay.  All right.

11    Anything anybody wants to add?  Anything you'd like to

12  point to in your papers or any last thoughts you'd like to leave

13  me with as I consider this matter?

14    Ms. Wyrick?

15    MS. WYRICK:  The only last thought I had is that, with

16  respect to the Daniels case, they cited to a number of

17  depositions and interrogatories and all of the discovery that

18  had to take place for an individual.  And I think that also just

19  plays into the fact of why it would be efficient to do this as a

20  matter of class certification and do this on a classwide basis,

21  establish liability, and then figure out the damages.

22    THE COURT:  Okay.  Mr. Feldman?

23    MR. FELDMAN:  Just one item, your Honor.  Should your

24  Honor deny class certification, that's your decision.  You may

25  or may not.  I hope you do, but you may or may not.

1    I think whether the Court keeps this case depends on

2  whether there's $75,000 at issue.  You can keep it if you want,

3  but you could remand it to state court.

4    But if you keep it, I think what you are going to find

5  is that if there's a trial on Cowden and Biddle it will be a

6  multi-day trial just on evidence specific to those two main

7  plaintiffs, just like there was much evidence in dispute for

8  Daniels and just like there's much evidence in dispute for each

9  of the 6,500 putative class members.

10    THE COURT:  All right.  Well, clearly, sometimes federal

11  courts manage discovery a little more closely than state courts

12  do, and we would -- regardless of how we proceed in this case,

13  this Court manages discovery pretty closely.  But your points

14  are both well taken.

15    I want to thank you all for your excellent papers and

16  your presentations here today.  This has been very helpful.  And

17  I will try to render a decision real soon.  Thank you.

18    And to all of you who are traveling, safe travels.

19  We'll be in recess.

20    (Proceedings adjourned at 3:33 p.m.)

21    I certify that the foregoing is a correct transcript from
   the record of proceedings in the above-entitled matter.

22

23    *Rhonda S. Sansom*                3/18/2013

24  _____    _____
     Rhonda S. Sansom, RPR, CRR              Date

25          ORIGINAL TRANSCRIPT FILED ELECTRONICALLY