UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
at LEXINGTON

CIVIL ACTION NO. 5:09-323-KKC

HAROLD DAVID COWDEN, et al.                                          PLAINTIFF

v.                          **OPINION AND ORDER**

PARKER & ASSOCIATES, INC., et al.,                                   DEFENDANT

\*\*\*\* \*\*\*\* \*\*\*\* \*\*\*\*

This matter is before the Court on the Motion for Class Certification (DE 55) filed by the Plaintiffs. For the following reasons, the motion will be denied.

**I.      Facts**

Defendant Parker & Associates, Inc. is an insurance agency that, through independent agents, sells insurance policies offered by various insurers. (DE 55, Mem. at 2; DE 61, Response at 9.) Defendant Dalvin Kendall Parker owns a majority of Parker & Associates and oversees its operations. (DE 55, Mem. at 3.) Plaintiffs Cowden and Biddle are insurance agents who sold Medicare Advantage Plans for Parker & Associates and affiliated companies. (DE 55, Mem. at 1.) Medicare Advantage is a type of health plan offered by a private insurance companies that provides insureds with Medicare Part C and Part D coverage. (DE 55, Mem. at 3.) The insured typically pays nothing for the insurance. (DE 55, Mem. at 3.)

The Plaintiffs assert that Parker & Associates agreed to pay them certain commissions on the MA plans they sold but that Parker & Associates has refused to pay

them and has, instead, kept the commissions received for itself. (DE 1-3, Complaint ¶¶ 4-5; DE 55, Mem. at 1). The Plaintiffs assert claims of fraud, negligent misrepresentation, breach of contract, unjust enrichment, conversion, and promissory estoppel against the Defendants.

The issue currently before the Court is whether the Plaintiffs should be able to bring this action as a class action. The Plaintiff seeks to represent a class consisting of:

> all persons who entered into agreements with Defendant Parker & Associates and/or other companies affiliated with Parker & Associates (collectively the "Parker Companies") to act as agents for the purpose of placing policies of Medicare Advantage Plans, Parts C & D ("MA Plans") with eligible insureds in return for monetary commissions and renewal fees in the Commonwealth of Kentucky and elsewhere in the United States, for the period beginning in or around 2004 through the present (the "Class Period").

(DE 55, Mem. at 1.)

The Plaintiffs estimate that the class would be between 1800 and 3,000 members. (DE 55, Mem. at 20; DE 70, Hearing Tr. at 6.) The Defendants estimate the class size would be 6,500 members. (DE 70, Hearing Tr. at 6.) The Defendants further estimate that class members would likely be located in every state. (DE 70, Hearing Tr. at 27.)

## II. Rule 23 Requirements

It is first important to note that a class action is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541, 2550 (2011) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700-01 (1979)). The party moving to certify the class has the burden of proving that class certification is appropriate. *In re American Medical Systems, Inc.*, 75 F.3d 1069, 1079 (6th Cir.1996). The Court must conduct a "rigorous analysis" of the

elements of Rule 23 before certifying a class. *Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 161 (1982). See also Fed.R.Civ.P. 23. "A party seeking class certification must affirmatively demonstrate his compliance with the Rule." *Dukes*, 131 S.Ct. at 2551.

Rule 23(a), sets forth four requirements for a class action: (1) the class must be so numerous that joinder of all members is impracticable, (2) there must be questions of law or fact common to the class, (3) the claims or defenses of the representative parties must be typical of the claims or defenses of the class, and (4) the representative parties must fairly and adequately protect the interests of the class.

The Defendants do not contest that the Plaintiffs meet all of these requirements. In addition to meeting all the prerequisites of Rule 23(a), however, the plaintiff must also show that the action satisfies at least one of the subsections of Rule 23(b). Here, the Plaintiffs seek certification under subsection (3) of Rule 23(b) which provides that the Court can certify a class if 1) "questions of law or fact common to class members predominate over any questions affecting only individual members," and 2) a class action is superior to other available methods for the fair and efficient adjudication of the controversy. Fed. R. Civ. P. 23(b)(3).

The Defendants argue that neither of these requirements are met in this action.

### A. Predominance

"To satisfy the predominance requirement in Rule 23(b)(3), a plaintiff must establish that the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole, . . . predominate over those issues that are subject only to individualized proof." *Beattie v. CenturyTel, Inc.*, 511 F.3d 554, 564 (6th Cir. 2007) (quotations and citation omitted).

The Plaintiffs' allege that Parker & Associates has failed to pay the agents commissions as Parker & Associates promised to do. The Defendants, on the other hand, argue that they have not wrongfully withheld any commissions at all. Instead, the Defendants argue, they have withheld commissions only from those agents who actually owe Parker & Associates money either because Parker & Associates advanced commissions to the agent that the agent did not ultimately earn or because Parker & Associates has paid various expenses on the agent's behalf that that agent has not yet paid back. (DE 61, Response at 1).

The first issue to resolve in determining whether Parker & Associates breached any obligation to pay the agents money is to determine what precisely Parker & Associates promised to pay the agents. For class certification purposes, the critical issue is whether the amount Parker & Associates promised to pay each agent can be proved with evidence applicable to the class as a whole.

Parker & Associates promised to pay the agents two kinds of commissions: a one-time commission which was paid the first year of any successfully placed policy and a "renewal" commission that was paid monthly beginning the 13th month of each policy. It appears that there are commission grids that set forth the amount that each carrier agrees to pay Parker & Associates for first-year and renewal commissions. Neither party has submitted all of the commission grids in the record. For purposes of this motion, the Court will assume that commission grids exist that explicitly state the amount that each insurer agrees to pay Parker & Associates for every policy sold by an agent.

Though it is not entirely clear from the parties' briefs or the arguments at the hearing on this matter, it is the Court's understanding that, while the commission grids set

forth the amounts that each carrier would pay *Parker & Associates* for first-year and renewal commissions, they do not necessarily set forth the amount that each *agent* would receive. This is because all of Parker & Associates' agents were placed in a hierarchy consisting of at least 12 levels. The hierarchies changed over time and were different for each carrier. (DE 61, Att. 2, White Dep. ¶¶ 5-6.)

When an agent successfully placed an MA plan, the agent and any agents above that agent in the Parker & Associates hierarchy for that carrier were entitled to a portion of the commission due from the carrier. (DE 55, Mem. at 9-10; DE 55, Ex. A, White Dep. at 46-47; DE 61, Att. 2, White Dep. ¶¶ 5-6.) Parker & Associates COO White explained in his deposition:

> When a carrier offers . . . a commission on a policy, they put out a schedule, a commission schedule, which has a commission for each type of product. That total commission is what is broken up into a hierarchy so that each level gets a portion of that commission. . . And that would hold true for both a first-year and a renewal commission.

(DE 66, Reply, Ex. A, White Dep. at 47-48.)

The portion of each commission paid to the selling agent's superiors in the hierarchy was called an "override." The Plaintiffs submit an "Agent Hierarchy List" (DE 55, Ex. P) that appears to set forth the hierarchy levels for 425 or so agents. It does not explain, however, how each commission would be divided among that group of agents.

Thus, it appears that determining the commission payment that Parker & Associates should have paid each agent requires both the applicable carrier's commission grid and the hierarchy list that would set forth that agent's place in the hierarchy for that carrier. But, because the grids and the hierarchy list do not appear to explain how each

5

commission payment was apportioned, some additional evidence would also be required. The Court is unclear as to what that evidence is.

In his deposition, Parker indicated that each agent is "told what he will be paid." (DE 55, Ex. B, Parker Dep. at 34.) Likewise, Biddle testified that there were no written documents regarding the commission payments that would be paid and that all such representations were oral. (DE 61, Att. 3, Biddle Dep. at 24-26.) If evidence regarding the amount that Parker & Associates agreed to pay each agent includes oral representations to each agent, then the amount Parker & Associates was obligated to pay each agent cannot be determined by evidence applicable to the class.

Regardless, because the Plaintiffs have not sufficiently explained what evidence is required to determine the amounts Parker & Associates promised to pay each agent, the Court cannot find that the commission payments owed to each agent for each sale of an MA plan can be determined through evidence applicable to the class as a whole.

Furthermore, according to the Defendants, the evidence regarding the date that Parker & Associates was obligated to pay renewals varies for each agent. (DE 61, Mem. at 3.) The Defendants assert that Parker & Associates' promise to pay renewals was made orally to each agent and, thus, the date that Parker & Associates was obligated to pay renewals was different for each agent. The Plaintiffs do not contest that assertion. Accordingly, it does not appear that the date that Parker & Associates became obligated to pay renewals can be proved with generalized evidence. That date will vary from agent to agent.

The Defendants also argue that at least some carriers ceased paying renewals when an agent was no longer licensed or certified to sell for a particular insurance

company. (DE 61, Mem. at 3; DE 70, Hearing Tr. at 38.) The Plaintiffs do not contest this. Thus, it does not appear that the date that Parker & Associates' obligation to pay renewals ceased can be proved through generalized evidence. That date will vary from agent to agent.

Furthermore, even if the commission amounts that Parker & Associates agreed to pay each agent can be established through generalized evidence, determining the total amount that Parker & Associates was obligated to pay each agent would require an individual analysis of the number of MA plans sold by each agent. Further, there is no dispute that, before paying commissions, Parker & Associates was permitted to deduct certain expenses from each agent's check. These expenses included 1) mailing expenses; 2) the policy premiums on errors and omissions insurance sold to the agent by a company owned by Parker; 3) charges for the names and contact information of potential MA plan purchasers, or "leads," sold to the agent by a company owned by Parker's wife; and 4) the amounts of any first-year commissions paid to the agent but not earned because the policy was ultimately rejected by the insurance carrier, or "chargebacks" to the agent's account.

The Plaintiffs argue that Parker & Associates has charged each agent more for expenses and chargebacks than each agent actually owes. As to mailing expenses, the Plaintiffs assert that Parker & Associates agreed to only charge each agent their actual mailing expenses but that it actually charged the agents more. (DE 55, Mem. at 13; DE 70, Hearing Tr. at 16.) For example, the Plaintiffs charge that Parker & Associates charged one agent $ 12.00 for a mailing when the actual expense to Parker & Associates

7

was $10.69 and that it charged another agent $12.00 for a mailing when Parker & Associates' actual mailing expense was $ 8.52.

With regard to the E&O policy premiums, the Plaintiffs assert that Parker & Associates paid the total amount due for the annual premium on a blanket E& O policy, divided that amount by the number of agents, and then charged each agent an equal amount.  (DE 55, Mem. at 14; DE 70, Hearing Tr. at 16.)  The Plaintiffs also complain that Parker & Associates charged at least the Plaintiff Biddle for E&O premiums even after Biddle had ceased working for Parker & Associates.  (DE 55, Mem. at 14.)

With regard to "leads," the Plaintiffs argue that Parker & Associates charged excessive fees to agents and overcharged the entire class but the Court is unsure of the basis for that argument.  (DE 55, Mem. at 12.)  The Plaintiffs assert that it was "atypical" in the MA industry to charge for leads. (DE 55, Mem. at 12.)  Thus, the Plaintiffs may be arguing that no agent agreed to pay for leads at all. (DE 55, Mem. at 12.)  The Plaintiffs also argue that the Defendants resold the same leads to multiple agents. (DE 1, Complaint, ¶ 26.)  Thus, the Plaintiffs may be arguing that they paid for leads believing they had an exclusive right to them and the Defendants violated that agreement.

As to chargebacks, Parker & Associates withheld 10 to 20 percent of the first-year commission payments owed to an agent and represented that it would hold that amount in escrow to cover any "chargebacks" to the agent's account.  (DE 55, Mem. at 14-15; DE 70, Hearing Tr. at 33.)   The Plaintiffs assert that Parker & Associates withheld $11,000,000 from commission payments earned by agents. (DE 55, Mem. at 15.)  Parker & Associates told the agents that any chargebacks would first be taken from the amounts held in escrow for each agent and that any excess would be deducted from the agent's

current earnings. (DE 55, Ex. S.) The Plaintiffs assert that Parker & Associates never actually established any escrow accounts. (DE 55, Mem. at 15.)

With regard to Plaintiff Biddle, the Plaintiffs assert that Parker & Associates deducted money from his last paycheck even though, at the time he stopped selling for Parker & Associates, he had money left in his escrow account and had no chargebacks. The Plaintiffs assert that Parker & Associates wrongfully claims that Biddle owes Parker & Associates $4400. (DE 55, Mem. at 15.)

Assuming that the Plaintiffs assert that these allegations pertain to the entire class, the Plaintiffs assert that Parker & Associates has inaccurately calculated the chargebacks owed by agents; failed to deduct the amounts owed by the agents from the amounts withheld from each agent's paycheck that should have been placed in escrow; and never returned the withheld amounts to the agents. (See also DE 66, Reply at 3.) Parker & Associates, for its part, asserts that it paid its agents $8,500,000 more in commission payments than it received from the carriers. (DE 60, Response, Att. 2, White Dep. ¶ 15.)

The Plaintiffs have not pointed to any generalized evidence that would prove Parker & Associates' promises or representations regarding the amounts it would charge the agents for mailings, E&O premiums, and lead expenses. Thus, the Court is unable to determine that these promises can be proved with generalized evidence. The Defendants have produced evidence that the agreement between the agents and Parker regarding the costs of leads, for example, varied from agent to agent. (DE 61, Response at 17.)

But even assuming that Parker & Associates' representations regarding expenses can be established through generalized evidence, the issue of whether Parker & Associates breached its obligation to pay agents commissions will require an individual

9

analysis of each agent's sales and expenses, the commission payments made to the agent, and any legitimate chargebacks to the agent's account. For example, in their motion, the Plaintiffs assert that Parker & Associates wrongfully claims that Plaintiff Biddle owes Parker & Associates $4,400 in chargebacks and/or expenses. (DE 55, Mem. at 15.) Determining whether Parker & Associates' claims are accurate will require an individual analysis of Biddle's sales, expenses, and chargebacks and the commission payments made to him.

The Plaintiffs also assert that the Defendants claim that Biddle owes expenses for four agents that were under him in the Parker hierarchy. The Plaintiffs argue that those five agents are not actually under Biddle. Determining whether each member of the class has been wrongfully charged for expenses of other agents will require an individual analysis of the expenses charged to each agent and of the agent's placement in the hierarchy and then an analysis of the expenses charged to each agent in the agent's hierarchy. (DE 55, Mem. at 15-16.) Furthermore, the individual analysis of one agent's account will have no bearing on whether Parker owes another agent money or not.

The Plaintiffs recognize that their claims require an individual analysis of each agent's sales and expenses but they argue that the individual analysis is only required to determine damages. They further argue that individualized damages determinations should not preclude class certification. (DE 55, Mem. at 30.) But individual analysis of each agent's accounts would have to be done not just to determine each agent's damages but to determine whether Parker & Associates breached its obligation to pay the agents commissions.

The Defendants have justified withholding commission payments from the agents by arguing that the agents owe Parker & Associates money for expenses and chargebacks. In fact, the Defendants allege that it has "advanced tens of millions of dollars of commissions to members of the putative class" and that "a large percentage of the proposed class actually owes money to Parker & Associates." (DE 61, Response at 1.) As a result, Parker & Associates argues it "has paid approximately $ 8.5 million more in commissions than it has received from the carriers." (DE 61, Response at 9.) Determining the Defendants' liability for withholding commission payments will require an analysis of each agent's legitimate expenses and chargebacks and the individual analysis of one agent is irrelevant to the analysis conducted for a second agent.

Furthermore, even assuming that damages are the only individualized issues in this matter, the matter is not appropriate for a class action. The Plaintiffs cite *In re Whirlpool*, 678 F.3d 409 (6th Cir. 2012) for the proposition that "[n]o matter how individualized the issue of damages may be, these issues may be reserved for individual treatment with the question of liability tried as a class action." *Id*. at 419 (quoting *Sterling v. Velsicol Chem. Corp.*, 855 F.2d 1188, 1197 (6th Cir.1988)). The Supreme Court recently vacated the judgment in *Whirlpool* and remanded the case to the Sixth Circuit for further consideration in light of *Comcast v. Behrend*, 133 S.Ct. 1426 (March 27, 2013). *Whirpool Corp. v. Glazer*, 2013 WL 1285305 (April 1, 2013).

In *Comcast*, the Supreme Court confirmed that, at least in some cases, "[q]uestions of individual damage calculations will inevitably overwhelm questions common to the class." *Id*. In *Roach v. T.L. Cannon Corp*., No. 3:10-CV-0591, 2013 WL 1316452 (N.D.N.Y. March 29, 2013), a case decided after *Comcast*, the plaintiffs

11

asserted that certain owners of Applebee's restaurants had violated a New York state law requiring that, when an employee works more than 10 hours in a day, the employee must receive an extra hour of pay. The plaintiffs did not submit a damages model that would allow damages to be measured on a classwide basis and instead argued, like the Plaintiffs argue in this case, that "damages need not be considered for Rule 23 certification even if such damages might be highly individualized." *Roach*, 2013 WL 1316452, at * 2. The court rejected that argument in light of *Comcast*, stating that "[b]ecause Plaintiffs have offered no model of damages susceptible of measurement across the entire putative 10-hour spread claim class, '[q]uestions of individual damage calculations will inevitably overwhelm questions common to the class.'" *Id*. (quoting *Comcast*, 133 S.Ct. at 1433.)

In this case also, the Plaintiffs have offered no manageable way to calculate damages across the entire class and the individual damages calculations that would be required will inevitably overwhelm any questions common to the entire class.

The Plaintiffs assert that the Parker & Associates COO stated in his deposition that Parker had performed reconciliations for each insurance carrier and, in that process, has already broken down what each agents is owed "agent by agent." (DE 70, Hearing Tr. at 57.) This may be true but the Court assumes that the Plaintiffs will not simply accept Parker & Associates' reconciliations. For example, the Plaintiffs dispute Parker & Associates' current assertion that Biddle owes it $4400.

Further, each reconciliation applies only to an individual agent. The fact that one reconciliation may show that Parker breached its obligation to pay one agent will not help to establish that Parker breached its obligation to pay another agent commissions. That second agent may well owe Parker money and the first agent's reconciliation is irrelevant

to that determination. Thus, the individual reconciliations are not evidence applicable to the class.

The Plaintiffs allege that Parker & Associates "failed to pay renewals, withheld commissions from agents, and charged excessive fees." (DE 55, Mem. at 29.) The only way to resolve those issues is to analyze each agent's account and those individual analyses will overwhelm any of the common issues in this matter.

For these reasons, the Plaintiffs have not have not met their burden of demonstrating that the issues in this action that are subject to generalized proof, and thus applicable to the class as a whole, predominate over those issues that are subject only to individualized proof.

### B. Superiority

Rule 23(b)(3) states that, in determining whether a class action is superior to other available methods for fairly and efficiently adjudicating the controversy, the Court should consider:

> (A)  the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B)  the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C)  the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D)  the likely difficulties in managing a class action.

In determining whether class members would have an interest in conducting separate lawsuits, the court should consider whether "the amounts at stake for individuals may be so small that separate suits would be impracticable." *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 616 (1997).

The Plaintiffs have provided no information regarding the potential recovery of any class members. The Plaintiffs stated at the hearing on this matter that they could not state what the typical amount of damage for class members would be. (DE 70, Hearing. Tr. at 6.) The Plaintiffs were unable to give even a "ballpark figure" on the damages that the named Plaintiffs have incurred. (DE 70, Hearing Tr. at 72.) Accordingly, the Court is unable to find that the potential individual damage awards in this action are "the types of award that would preclude individual class members form seeking relief through litigation." *See Pipefitters Local 636 Insurance Fund v. Blue Cross Blue Shield of Michigan,* 654 F.3d 618, 632 (6th Cir. 2011) (quoting *Beattie*, 511 F.3d at 567).

Further, as discussed above, determining liability and damages in this action would require the court to conduct detailed, individualized inquiries into each agent's account. "Given the necessary number of individual inquiries, a class action cannot be a superior form of adjudication." *Pipefitters Local 636*, 654 F.3d at 631.

Thus, the Plaintiffs have failed to meet their burden of demonstrating that a class action is a superior method of adjudicating this action.

### III. Conclusion

For all these reasons, the Court hereby ORDERS that the Plaintiffs' Motion for Class Certification (DE 55) is DENIED.

Dated this 22nd day of May, 2013.



Signed By:
*Karen K. Caldwell*  KKC
United States District Judge